[No. 2,380.]

# THE OAKLAND COTTON MANUFACTURING COMPANY v. JOHN G. JENNINGS.

LIABILITY OF CHARTERER OF A VESSEL. — If a vessel is chartered in the usual way, either for a particular voyage or for a period of time, the charterer having authority to appoint the master, and undertaking to victual, man, and navigate her at his own expense, he will be deemed the owner *pro hac vice*, and the general owner will not be personally liable on contracts of affreightment or for supplies.

LIABILITY OF OWNER OF VESSEL. — If the owner charters the hold of his vessel, but appoints her master and sails her at his own expense, he will be liable on contracts of affreightment made by the master with shippers who have no notice of the charter party.

LIABILITY OF OWNER OF VESSEL FOR CONTRACTS OF MASTER. — If the registered owner of a vessel appoints her master, with an agreement that the master is to have the entire control of the vessel, and victual and man her, and make contracts of affreightment, and divide the gross earnings with the owner, the owner is liable on contracts of affreightment made by the master with shippers who have no notice of the arrangement between the master and owner.

APPEAL from the District Court of the Third Judicial District, County of Alameda.

The cause was tried before a jury, and the Court instructed them as follows :

"I am asked by defendant to give you two instructions. The first I give you, and it is as follows :

"'If you shall find that the accident to the schooner Greenfield, by which the loss mentioned in the complaint occurred, was occasioned by a peril of navigation, you will find a verdict for the defendant.'

"The other instruction I will not give you. It is based upon a defense attempted to be set up by defendant, and which has been ruled out by the Court.

"Defendant contends that the general owner can, by chartering and delivering entire and exclusive possession and control of his vessel to third parties, release himself for lia-

bility for damages on breaches of contracts for supplies, and of affreightment made by them while in possession of the vessel.

"The decisions referred to by counsel to sustain this proposition are exclusively from Maine and Massachusetts. Both of those States have passed statutes modifying the common law in this respect, and limiting the liability of general owners of chartered vessels. The decisions quoted expound the law as modified by those statutes.

"In March, 1861, Congress passed an Act limiting the liabilities of general owners of vessels, under certain circumstances, and to a certain extent; but that Act excepts from its provisions vessels used in navigating rivers, and in inland navigation, and it is, therefore, not applicable to the case now before the Court.

"Of course the general owner and the master of a ship may make any arrangement in relation to a ship they may see fit. The master may hire a vessel, take possession of her, appoint his crew, run her at his own expense, and have entire control of her, by arrangement between himself and the owner ; yet I cannot see how this arrangement, made between the owner and the charterer, can limit the legal liabilities of either to outside parties to whom they engaged as common carriers.

"The tendency of modern American decisions has been to hold any private arrangement on the part of common carriers insufficient to release them from their liability as such, and I know of no reason why this rule should not be applied to owners of ships.

"The latest decisions upon this subject are in New York, not based upon statutes, as are those from Maine and Massachusetts, and they hold a doctrine contrary to that contended for by defendant.

"Under the circumstances, I have ruled that no arrangement that may exist between the general owner and char-

terer of his vessel, as to the employment or custody of the vessel, can affect third parties dealing with the master or charterer of the vessel, unless it is shown that they had received notice of such arrangement. I shall rule out that defense, and do not give you the second instruction asked by defendant."

Defendant's second instruction, which the Court refused to give, was as follows:

"If you shall find that the schooner Greenfield was, at the time of the accident, employed, under agreement with the defendant, by Captain Horton, the master thereof, on shares, and that Captain Horton at that time manned and victualed said vessel at his own expense, and paid all expenses of running her, except for repairs, and employed her in carrying freight, he collecting the freight money, and accounting to the owner only for the share of the latter, and that said Horton had at the time, by virtue of said agreement, exclusive possession and control of her, your verdict will be for the defendant."

The plaintiff recovered judgment in the Court below, and the defendant appealed.

The other facts are stated in the opinion.

*McAllisters & Bergin,* for Appellant.

Let us see from the authorities whether the Court was correct in charging that no arrangement could be made without notice which would shift the responsibility.

"Where a steam vessel was let by charter party, the registered owners agreeing to keep the engine in order, but the charterer was to pay for all other repairs, it was held that repairs ordered by the charterer, who was also the Captain, except those necessary for the engines, could not be charged

to the general owner, although the person making the repairs was unacquainted with the special agreement between the parties."

Lord DENMAN, C. J., says: "The question is who were the contracting parties? The mere circumstance of ownership may be sufficient to create a liability where the vessel has been left under the control of a party who had given orders, if no intervening ownership has been created. But if a ship is let out to hire, I do not see how the owners are liable for work done upon it by order of the party hiring, more than the landlord who lets a house." (*Reeve* v. *Davis*, 1 A. & E. 312.)

The law, I think, is perfectly well settled that where there is a charter party, and by its terms the charterers, as in this case, are to have the exclusive possession, control, and management of the vessel during the term specified, are to appoint the master, run the vessel, and receive the entire profits, they, and not the general owners, are to be deemed the owners, and are alone responsible for damages. (*Hill & Conn.* v. *Golden Gate*, Newb. Ad. 313; *Gracie* v. *Palmer*, 8 Wheat. 632; *MacCardier* v. *Chesp. Ins. Co.* 8 Cranch, 39; Abbott on Shipping, 57 N. 1; *Tuckerman* v. *Brown*, 17 Barb. 191; see, also, *Thomas* v. *Osborn*, 19 How. U. S. 22.)

There is no doubt that the owner is personally liable for necessaries furnished and repairs made to a ship by order of the master, and the great point for discussion is, who is to be regarded as contracting party and owner *pro hac vice?* The ownership in relation to this subject is not determined by the register, and the true question, in matters relative to repairs, is, "upon whose credit was the work done?" (3 Kent's Com. 133, 137; *McIntyre* v. *Bourie*, 1 John. 229; *Hallett* v. *Columbian Ins. Co.*, 8 Johns. 272; *Taggart* v. *Loring*, 16 Mass. 336; *Gracie* v. *Palmer*, 8 Wheat. 632; *Lamb* v. *Parkman*, 1 Sprague, 343; *Mascardier* v. *Chesapeake Ins. Co.* 8 Cranch, 39.)

Where a master hires a vessel "on shares," under an agreement to victual and man the vessel, and employ her in such voyages as he thinks best, having thereby the entire possession, command, and navigation of the vessel, and the relation of principal and agent not existing between the master and owners, the master thereby becomes the owner *pro hac vice* during such time as the contract exists; and he, and not the general owner, is responsible for necessary supplies. (*Webb* v. *Pierce,* 1 Curtis C. C. 104; *Saxton* v. *Reed,* Hill & Denio, 323; *Sims* v. *Howard,* 40 Me. 276.)

· Mr. Justice GRIER, in *Weaver* v. *The S. G. Owens,* 1 Wallace, Jr., 359, enunciates the same doctrine declared by the United States Supreme Court.

The above principles, enunciated by Justices STORY, CURTIS, GRIER, NELSON, WARE, WELLS, and the Supreme Court of the United States, are adopted and declared to be the law of the land by the leading elementary writers upon this subject. (1 Parsons, Mar. Law, 493 : 3 Kent, 138; 1 Parsons on Adm. and Shipping, 280, 281.)

*Botts & Wise,* for Respondent.

Can a private arrangement exist between the general owner and his captain, by which the general owner will be relieved from his liability to persons employing the vessel without any knowledge of such private arrangement?

We are aware that there are some high authorities opposed to us, which are cited by our learned opponents. But we claim that the weight of authority is on our side; and, upon principle, we hope to show, beyond the possibility of a doubt, that no such arrangement as is set up in the answer in this case can be permitted to affect us.

By the general maritime law of this country, as well as of Europe, so far as we are acquainted with the same, the master of a vessel is the agent of the owner; and the maritime law authorizes this agent to do various things, which

result from his official capacity. He has authority to make contracts, belonging to the ordinary employment of the vessel; to let her to a charter party, or take shipments on freight; to hire seamen for the voyage; to contract for necessary repairs and shipments for the voyage; to hypothecate his ship in a foreign port, for moneys advanced to supply the necessities of the ship; and in all these cases he may enter into a contract in his own name, thus giving him more authority than any ordinary agent. By entering into the contract in his own name he becomes personally liable, as well as his principal, to fulfill the same. "For he is treated," says Mr. Justice STORY, "not as an ordinary agent, but as in some sort, and to some extent, clothed with the character of a special employer of the ship, and representing not merely the absolute owner (*diminus navis*), but also the temporary owner or charterer for the voyage. (*Exercitar navis*.) In short, our law treats him as having a special property in the ship, and entitled to the possession of it, and not having the charge of it as a servant. On this account he may bring an action of trespass for a violation of that possession; and where the freight has been bound under a contract to which he is a party, or under a bill of lading signed by himself, he may bring a suit for the freight on the delivery of the goods." (Story on Agency, Sec. 116.)

Even in her home port the captain has authority to ship her officers and crew, to superintend her ordinary outfit, equipment, and repairs, and other preparations for the voyage; of loading and unloading her cargo, and of receiving goods on board as freight, and of signing bills of lading. He can also borrow money on her credit in certain specified cases. (Story on Agency, Sec. 119, *et seq.*; also Sec. 36.)

These are some of the very extensive powers of a captain of a vessel engaged in trade—powers absolutely necessary for the good of the owner as well as shippers, and also absolutely necessary for the good of general commerce. In this

and in every case, Jennings, by taking out papers for the schooner, by appointing Horton her captain, informed us and the whole world, who wished to ship goods on his vessel, that Horton was his appointed and credited agent. Is there anything which they set up in their answer that Horton was bound to do under their agreements, which he could not do as the agent of Jennings?

Mr. Justice STORY, in section two hundred and ninety-eight of his work on Agency, expressly states that any private agreement between the owner and master, by which the latter is to have the entire ship for his own use for a specific period, and to make all repairs at his own expense, cannot vary the rights of third parties.

In *Rich* v. *Coe*, Cowper, 636, it appeared that Rich supplied a ship with cables, by the order of the master, and made the captain and owners of the ship debtors without knowing who they were. The ship was let to the captain, and he was to have the sole management of her, and employ her for his own use and benefit for eleven years; he was to pay thirty-six pounds per annum; that he was at his own cost and charge to repair, maintain, and keep her in good repair. It also appeared that plaintiff had no notice of the contract. The case was fully argued, and Lord MANSFIELD, in deciding it, said: "After the fullest deliberation, we think it impossible to say that the plaintiff is not entitled to recover. Whoever supplies a ship with necessaries has a treble security: 1. The person of the master. 2. The specific ship. 3. The personal security of the owners, whether they know of the supplies or not. 1. The master is personally liable, as making the contract. 2. The owners are liable for the master's act, because they chose him."

The authorities in New York, for the most part, follow this rule. In that great commercial center they have been compelled to overrule their previous decisions and to adopt the rule we contend for. (*Kenzel* v. ——, 37 Barb, 113;

*Vose* v. *Cockroft*, 45 Barb. 60 ; *McCready* v. *Thorne*, 49 Barb. 438; *Saxton* v. *Reed*, Sup. to Hill and Denio, 323.)

By the Court, CROCKETT, J. :

The defendant being the owner of the American schooner Greenfield, caused her to be duly enrolled at the port of San Francisco, with one Enos as master. Subsequently he appointed Horton as master in place of Enos; but whether the change of masters was reported at the Custom House and noted or recorded, does not appear. Some time after Horton took command of the schooner the defendant entered into an agreement with him to the effect that Horton was to have the entire control and mangement of her; was to make whatever contracts of affreightment he saw fit; to employ her in any business he desired, within the inland waters of the State ; to victual, man, and navigate her at his own expense, and to collect all her earnings; and to pay to the defendant one third of her gross earnings, at the end of each month, or as often as a settlement was had between them— the defendant to keep the schooner seaworthy and in repair. Subsequently Horton entered into an agreement with one Finney, to the effect that the schooner was to be run for their joint benefit, under the contract with the defendant, and thereafter she was controlled and managed by the two jointly.

The plaintiff contracted with Finney, acting on behalf of himself and Horton, to transport certain machinery, on the schooner, from San Francisco to Clinton, on the opposite side of the bay. But owing to negligent stowage, the schooner capsized during the voyage, and the machinery was partially lost, and the remainder damaged. The action is to recover damages for a breach of the contract of affreightment. On these facts, the defendant insists that he is not liable, for the reason that the schooner was not under his control or man-

agement, or navigated by his servant or agents, but by Horton & Finney, under the contract, they having the exclusive control and possession of her, with a right to make such contracts of affreightment as they saw proper; that Horton was in no sense the agent of the owner, with authority to bind him in maritime contracts, without his consent. On the other hand, the plaintiff claims that, by the maritime law, the master appointed by the owner is his agent to make contracts of affreightment, and that no secret agreement between the master and owner, of which the shipper had no notice, can exempt the owner from liability.

It appears to be well settled, that if a vessel be chartered in the usual manner, either for a particular voyage or for a period of time, the charterer having the authority to appoint the master, and undertaking to victual, man, and navigate her at his own expense, *he* will be deemed the owner *pro hac vice*, and the general owner will not be personally liable for supplies, or under contracts of affreightment. This proceeds upon the ground, that as the charterer appoints the master and has the exclusive control of the vessel, the master is *his* agent and not the agent of the general owner, who does not, therefore, hold himself out to the world as the principal for whom the master is authorized to act. In respect to a contract of affreightment, the general owner in such a case would not be liable, for the further reason, that inasmuch as the vessel was not navigated by him, or at his expense, or by his agents or servants, or for his benefit, he was not a common carrier, and was, therefore, not amenable as such. I do not understand the counsel for the plaintiff to controvert these propositions; but, at all events, they are abundantly supported by authority in this country and in England. It is equally clear that if the owner let out to charter the hold of the vessel, appointing his own master, and sailing her at his expense, he will be responsible on contracts of affreightment made by the master with the shippers, hav-

ing no notice of the charter party. (*Sandemann* v. *Scurrer*, 2 Law Reports, 86; *In Re St. Cloud*, Browning & Lushington R. 15.) In the first of these cases, COCKBURN, C. J., bases his conclusion on the ground "that the plaintiffs having delivered their goods to be carried, in ignorance of the vessel being chartered, and having dealt with the master as clothed with the ordinary authority of a master, to receive goods and give bills of lading on behalf of his owners, are entitled to look to the owners as responsible for the safe carrying of the goods. We think that so long as the relation of owner and master continues, the latter as regards parties who ship goods in ignorance of any arrangement whereby the authority ordinarily incidental to that relation is affected, must be taken to have authority to bind his owner by giving bills of lading. We proceed on the well known principle that where a party allows another to appear before the world as his agent in any given capacity, he must be liable to any party who contracts with such apparent agent in a matter within the scope of such agency. The master of a vessel has, by law, authority to sign bills of lading on behalf of his owners.

A person shipping goods on board of a vessel, unaware that the vessel has been chartered to another, is warranted in assuming that the master is acting by virtue of his ordinary authority, and therefore acting for his owner in signing bills of lading. It may be that as between the owner, the master and the charterer, the authority of the master is to sign bills of lading on behalf of the charterer only, and not of the owner. But in our judgment this altered state of the master's authority will not affect the liability of the owner, whose servant the master still remains, clothed with a character to which the authority to bind his owners by signing bills of lading attaches by virtue of his office. We think that until the fact that the master's authority has been put an end to is brought to the knowledge of a shipper of goods,

the latter has a right to look to the owner as the principal with whom his contract has been made."

This reasoning commends itself strongly to our judgment, and appears to be unanswerable. In the case at bar, the master was appointed by the defendant, who was the registered owner; and whatever may have been the secret understanding between them, in respect to the management, employment, and sailing of the vessel, or the appropriation of the earnings, persons dealing with the master in ignorance of this understanding, were warranted, in the language of Chief Justice COCKBURN, "in assuming that the master was acting by virtue of his ordinary authority and therefore acting for his owners in signing bills of lading." When Horton was appointed and entered upon his duties as master, the law conferred upon him authority to bind the owner in contracts of affreightment. By the act of appointing him, the defendant notified the public that Horton was his agent for this purpose. After thus openly proclaiming the agency, he is not at liberty secretly to revoke it whilst it ostensibly continues, in so far as persons are affected by it who dealt with the master within the scope of the agency in ignorance of the revocation. It is a familiar principle governing all agencies that so long as the principal permits the agency ostensibly to continue, even though it has been secretly revoked, the principal is bound by the acts of his apparent agent within the scope of the agency, in respect to persons dealing with the agent without notice of the revocation. In Story's Agency, section four hundred and seventy, it is said that "the revocation, as between the principal and agent, takes effect from the time *when* the revocation is made known to the agent, and as to third parties, when it is made known to them and not before. Until, therefore, the revocation is so made known it is inoperative. If known to

the agent, as against his principal, his rights are gone, but as to third persons who are ignorant of the revocation, his acts bind both himself and his principal." It must be conceded, I think, on all sides, that by appointing the master, the owner, by a notorious act, constitutes him his agent to enter into contracts of affreightment, and if he can secretly revoke the agency, so as to affect third persons who are ignorant of the revocation, without revoking the appointment of the master, it must be because agencies of this description stand upon a different footing from other agencies and are excepted from the operation of the general rule. But there is no sound reason for the exception. On the contrary, considerations of public policy and fair dealing appear to me to require a strict application of the rule to this class of agencies. Otherwise the general owner who appoints the master, and permits him, under the appointment, to continue in command of the vessel, thereby inviting the public to deal with him as the agent of the owner, may wholly escape responsibility for the acts of his ostensible and accredited agent by entering into a secret agreement with the master, of the terms of which the public are not informed. If he could thus escape responsibility it would impose upon shippers the necessity of inquiring, at their peril, not only who was the owner, and by whom the master was appointed, but also what secret understanding or agreement existed between them in respect to the management and sailing of the vessel. In my opinion the interests of commerce demand that this onerous duty should not be imposed upon shippers, and that the owners of vessels navigated by masters appointed by them should be subject to the responsibilities which usually pertain to the relation of owner and master in dealing with those who are ignorant that those relations are different from what they prima facie are. I am aware that there is apparently a considerable conflict in the authorities

on this point, but, in my opinion, those which hold the views above stated are supported by the better reasoning.

Judgment affirmed.

Neither Mr. Chief Justice WALLACE nor Mr. Justice NILES expressed an opinion.