[Civ. No. 3285. Third Appellate District.—July 22, 1927.]

C. A. STOWE, Respondent, v. JOHN D. MAXEY, etc., Appellant.

Louttit, Stewart & Louttit and Tye & Edwards for Appellant.

Gumpert & Mazzera for Respondent.

PLUMMER, J.—This is an action in equity brought to restrain the defendant, as the auditor of the county of San Joaquin, from drawing his warrant upon the treasurer of said county, in payment of a certain claim allowed by the board of supervisors in favor of the San Joaquin County Fair As-

sociation. The plaintiff had judgment and the defendant appeals.

The transcript shows that in 1919 the San Joaquin County Fair Association was incorporated as a nonprofit corporation, for the purpose of advertising, exploiting, and making known the resources of San Joaquin County, etc. During that year a county fair was held by said association in said county at a site called "Oak Park." Prior to the incorporation of the association just referred to and at all times since said date the county of San Joaquin was and has been the owner of certain premises known as and called the Fair Ground site near the city of Stockton, upon which are located a race-track, stables, exhibition buildings, and a grandstand. During the years 1920, 1921, 1922, 1923, and 1924 the San Joaquin County Fair Association has conducted fairs upon the premises last herein referred to. These fairs have been conducted upon said premises with the knowledge and consent of the individual members of the board of supervisors of San Joaquin County, but it does not appear from the transcript that the board of supervisors either expressly or impliedly took any legal action in reference to the use and occupation of said grounds by the San Joaquin County Fair Association, or with reference to the improvements and expenditures thereon made by the association.

The transcript shows that after taking possession of the fair grounds the association proceeded to make many improvements thereon in the erection of buildings, fences, barns, turnstiles, installation and conduct of a cafeteria, and generally doing all those things necessary to the conduct of a county fair upon said premises. It further appears from the transcript that the fair association proceeded to collect moneys from the sale of admission tickets and otherwise, and applied the same toward the payment of the expenses of conducting the fair and in the erection and furnishing of the buildings referred to, and in the purchase of personal property deemed necessary in the conduct and maintenance of county fairs.

It further appears that with the conclusion of the county fair held by the San Joaquin County Fair Association in the year 1924 the expenses at that time showed an excess of some $15,000 over receipts. For the purposes of paying off

the deficit incurred by the San Joaquin County Fair Association, a corporation, in the conduct of the fairs referred to, a claim for approximately $15,000 was filed against the county of San Joaquin; the expenses making up this claim appear to have been incurred during the years 1923 and 1924. Upon the presentation of this claim the board of supervisors on the twelfth day of January, 1925, adopted the following resolution:

"Whereas, the County of San Joaquin is the owner of that certain real property, and the improvements thereon, known as Agricultural Park, which said property has been heretofore acquired by said County and improved with exposition buildings, race track, stadium, and other recreation and amusement park features; and

"Whereas, the San Joaquin County Fair Association, a private corporation heretofore, with the sanction and consent of said Board of Supervisors, took charge of and made certain improvements in and about said Agricultural Park for the purpose of improving same as a public recreation ground and park and rendering same more suitable for the carrying on of a County Fair for the purpose of collection, preparing and maintaining exhibitions of the products and industries of the County of San Joaquin as a domestic exposition, and for the purpose of exhibiting and advertising the agricultural, mineral and other resources of said County, and did, in the month of August, 1924, hold, at said Agricultural Park, in said County, a domestic exposition known as the San Joaquin County Fair, for the purposes aforesaid; and

"Whereas, said San Joaquin County Fair Association, a private corporation, has presented, or caused to be presented to this Board of Supervisors certain demands against the Treasurer of the County of San Joaquin for allowance and payment for certain debts incurred by said San Joaquin County Fair Association for and on behalf of the County of San Joaquin; and

"Whereas, it further appears to this Board that the hereinafter specified claims and demands are legal charges against the county of San Joaquin pursuant to subdivision VI, of Section 4041 of the Political Code of the State of California empowering Boards of Supervisors to pay out of the general fund the expenses of improving public

pleasure grounds, public parks, and to preserve and take care of the same, as to such of said claims hereby so designated to be paid out of the General Fund, and that the remainder of said claims hereinafter so designated to be paid out of the Immigration Fund, are, similarly legal charges against the County of San Joaquin pursuant to Section 4056b of the Political Code of California, also subdivision 33 of Section 4041 of the Political Code of the State of California authorizing and empowering Boards of Supervisors to levy certain taxes for the purposes of creating a fund to be used for collecting, preparing and maintaining an exhibition of the products and industries of the County for the purpose of advertising, exploiting, and making known said resources for the purpose of inducing immigration and increasing the trade and commerce of said County, and providing said claims and demands are, by appropriate resolution ratified by this Board of Supervisors as having been incurred for and on behalf of said County of San Joaquin for its use and benefit, now therefore,

"It is hereby resolved and ordered that the incurring of the hereinafter designated claims and demands heretofore incurred by the San Joaquin County Fair Association, a private corporation, as aforesaid, be, and the same hereby are ratified by the Board of Supervisors of the County of San Joaquin as having been incurred for its use and benefit for and on its behalf and the same are hereby approved, allowed and ordered paid to the following named persons, firms and corporations, in the amounts set out after their respective names, from the General Fund and the Immigration Fund of said County of San Joaquin, as hereinafter designated."

This resolution is the first official action taken by the board of supervisors in relation to the county fairs held in said county by the San Joaquin County Fair Association, a corporation.

The manner in which the fair association took general charge of the fair grounds and proceeded with its improvement of the same, the erection of buildings, and the holding of county fairs, is fully shown by the testimony of W. L. Douglas, the manager of the fair association. His testimony is as follows: "My introduction to the board of supervisors was in June, 1920, when they came out to the Fair

Grounds and the board of directors of the Fair Association and the board of supervisors and myself met on the grounds; I think it was June 16, 1920; now at that time, they had a tentative agreement that they would go ahead and expend some money in the improvement of the grounds; the Fair Association had been organized for two years and held a fair at Oak Park in 1919; the supervisors said they would expend a certain amount of money on cattle barns and a certain amount of money on the pumping plant; there was no resolution made at that time, there was no written agreement, but it was agreed at that time among themselves— the Fair Association directors and the board of supervisors that the Fair Association would go ahead, run the fair, put on a fair during the year 1920, after this money had been expended; since that time, each and every year, we have had various and numerous meetings with the supervisors, sometimes in their office, sometimes at the fair grounds; we have all been to the Fair Grounds together; the board of supervisors have gone out there and gone over the whole grounds with me; I showed it to them, told them what we were doing, showed them the improvements, asked their advice in various matters and various things that should be done and they have always been constantly apprised of what the Fair Association was doing towards improving and conserving the property on the San Joaquin County Fair grounds; I called upon the board of supervisors one time and asked them to change the name from Agricultural Park to San Joaquin County Fair Grounds. I know of that resolution and the question came up of renting the stalls on the grounds; they sent me a letter advising me to go ahead and collect stall rent—rent stalls and collect money therefor; those are the only resolutions that I have any record of, but the supervisors meeting with them at various time—they have always been advised what we are doing.''

In 1924, in preparation for the 1924 fair, the transcript shows that the association furnished materials and supplies, constructed fences about the race-track, cared for the grounds, repaired the buildings, installed a pump and turnstiles, and performed other work considered necessary in connection with the holding of the county fair.

The trial court, found among other things, that in all matters connected with or pertaining to the construction, repair, furnishing, improving, preserving, managing, and controlling the buildings and improvements on said premises, in the purchasing and furnishing of materials, supplies, etc., the San Joaquin Fair Association used and exercised its judgment and discretion and the judgment and discretion of its officers; that the county of San Joaquin and the board of supervisors of said county and the members of said board of supervisors did not exercise or use any judgment or discretion therein, nor did any officer of the county exercise any judgment or discretion in relation of said matters, and, summarizing the findings of the court which are quite lengthy, it is found that all the work of construction, repairs, furnishing, improvements, preservation, management, control, etc., the quantity and quality of the work to be done, the amount to be paid therefor, and everything practically connected therewith, was done and performed upon the initiative of the San Joaquin County Fair Association, without any action whatever on the part of the board of supervisors, or any purchasing agent of said county.

The first official action of the board of supervisors relative to the expenditures made and indebtedness incurred by the San Joaquin County Fair Association, a corporation, was the passage of the resolution which we have herein set forth.

The transcript further shows that during all the times mentioned herein the county of San Joaquin had a duly appointed and acting purchasing agent, as provided for in subdivision 21 of section 4041 of the Political Code, and, therefore, as provided for in subdivision 7 of said section, in order to require bids for furnishing materials, supplies, and work for the county, the aggregate sum to be expended under the contract must exceed the sum of $1,000. The court in this case has found that the contracts exceeded said sum.

The appellant's contention in the first instance is based upon the provisions of subdivisions 6 and 33 of section 4041 of the Political Code and section 4056b of said code. The inapplicability of subdivision 6 of section 4041 is apparent, however, as it nowhere relates to the holding of fairs or performing the acts generally done and performed by the

San Joaquin County Fair Association, as shown by the testimony set forth in the transcript.

Subdivision 6 of section 4041 of the Political Code empowers the board of supervisors to purchase, receive by donation, lease, or otherwise acquire water rights, or real or personal property necessary for the use of the county, for a courthouse, jail, hospital, historical museum, art gallery, art institute, stadium, and almhouse, an exposition building or buildings, public pleasure ground, public parks, and other public purposes, and also property upon which to sink wells, etc. Provision is made as to the manner of acquiring such property. The method therein provided for was not followed in the case at bar, if the section were otherwise applicable.

Subdivision 33 of section 4041 authorizes boards of supervisors to levy a special tax not exceeding two cents on the hundred dollars of the assessed valuation of all property within the county to be used for advertising, exploiting, and making known the resources of the county for the purpose of inducing immigration to, and increasing the trade and commerce of, said county, or for the purpose of exhibiting or advertising the agricultural, mineral, or other resources of the county, and further specifying that if the taxes so levied do not raise the sum of $5,000, the board of supervisors may appropriate from the general fund of the county an amount sufficient to make up the deficit between the amount received from the taxes and the said sum of $5,000.

Section 4056b of the Political Code empowers the board of supervisors of the several counties of the state of California to levy a special tax on the taxable property within their respective counties for the purpose of creating a fund to be used for collecting, preparing, and maintaining an exhibition of the products and industries of the county at any domestic or foreign exposition, etc., specifying, however, that the total tax for any such purposes in any one year shall not exceed six cents on each one hundred dollars of taxable property, and providing that such taxes shall only be levied by a two-third vote of the members of the board.

The transcript does not show compliance with any of the sections or subdivisions of sections of the Political Code.

Section 13 of article XI of the state constitution prohibits counties from incurring indebtedness or liability for any purpose exceeding in any one year the income and revenue provided for such year, without the consent of two-thirds of the qualified electors thereof, voting at an election held for such purpose.

There is no allegation in any of the pleadings in this action, nor in the briefs, indicating compliance with the sections of the code relative to raising money for the holding of expositions, but it would inferentially appear that no such action was taken by the board of supervisors of the county of San Joaquin, from the fact that the first official act in relation thereto or pertaining to any of the matters involved in this action was the passage of the resolution dated January 12, 1925.

We are thus brought to a consideration of the questions whether the board of supervisors of the county of San Joaquin could legally delegate to the San Joaquin Fair Association the performance of the work, the holding, conducting, management of county fairs, making such expenditures as the association saw fit, exercising its own judgment, as found by the trial court, and then after all such expenditures have been incurred, ratify the same so as to make the difference between the money received and the money paid out by the San Joaquin County Fair Association, a corporation, a valid claim upon the treasurer of the county of San Joaquin.

The answers to these questions are so clearly and distinctly set forth in the opinion filed by the learned judge of the trial court that we take the liberty of quoting therefrom *in extenso:*

"This is an action brought by the plaintiff, a citizen and taxpayer of this county, to restrain the County Auditor from drawing on the County Treasurer of this county warrants in payment of certain claims that were, on or about the 12th day of January, 1925, approved and allowed by the Board of Supervisors of this county in the sum of $14,988.25, all of which were in favor of San Joaquin County Fair Association, a Corporation, with the exception of $95.25 in favor of one F. A. Groom. . . . The expenditures on which the claims of the Fair Association are based were made by the Association during the year 1924, and were

made, as shown by the testimony, in the construction of permanent improvements on certain premises used for Fair Ground purposes, and owned by the County of San Joaquin, and also in the purchase by the Association of certain personal property for the equipment and necessary use on such property; . . . The first official cognizance, however, that was taken by the Board of Supervisors of the county of the making of these improvements, or the procuring and furnishing of this personal property, was on January 12, 1925, when the Board of Supervisors, . . . made and entered its resolution wherein. it 'resolved and ordered that the incurring of the hereinafter designated claims and demands heretofore incurred by the San Joaquin County Fair Association, a private corporation, as aforesaid, be, and the same hereby are ratified by the board of supervisors of the County of San Joaquin as having been incurred for its use and benefit for and on its behalf, and the same are hereby approved, allowed and ordered paid to the following named persons, firms and corporations, in the amounts set after their respective names, from the General Fund and the Immigration Fund of said County of San Joaquin, as hereinafter designated: From General Fund, San Joaquin Co. Fair Ass'n, as per bill of items attached—$2366.03; F. A. Groom, Stockton, Calif., as per bill of items attached, $95.25; . . . San Joaquin Co. Fair Assn., as per bill of items attached, $2706.79; San Joaquin Co. Fair Assn., as per bill of items attached, $3800.00; San Joaquin Co. Fair Assn., as per bill of items attached, $4245.09. From Immigration Fund . . . San Joaquin Co. Fair Assn., as per bill of items attached, $1785.54.' . . . In view of the resolution passed by the Board of Supervisors, plaintiff's sole claim in this proceeding is that the claims in question were not in the first instance incurred in the manner limited and required by law defining the powers of boards of supervisors, and that consequently the Board of Supervisors was without power or jurisdiction to subsequently approve and ratify the making of the expenditures upon which the claims were based. Therefore, since the charges and allegations of plaintiff's complaint go to the extent of attacking the jurisdiction and powers of the Board of Supervisors to create a claim against the county by the subsequent attempted ratification of acts and conduct which the Board

in the first instance was without power to perform, this action on these grounds, and on these grounds alone, was within the power and right of the taxpayer to commence. For it involves solely and entirely a question of the law touching the proper limits of the Board of Supervisors, and not merely a question of fact in the exercise by the Board, in a proper and legal manner, of its vested powers. Consequently this controversy involves more than a question of mere personal or private rights of citizens, it involves the manner of exercise by the Board of Supervisors of its limited powers in the expenditure of public funds. It is for this reason that the merely subsequent approval by the Board of Supervisors of the claims in question under the allegations of this complaint will not protect the Auditor or the Treasurer in the drawing or cashing of the warrants in question. As stated by our Supreme Court in the case of *Walton* v. *McPhetridge,* 120 Cal. 440, at page 443 [52 Pac. 731, 733]: 'If illegal claims are allowed by the board it will be the duty of the auditor to refuse to draw warrants therefor.' (*Linden* v. *Case,* 46 Cal. 175); and the 'auditor ought not to draw his warrant for an illegal demand, even though allowed by the board, and if he does so knowingly and willfully he is personally responsible, and may be made to refund the money thus illegally paid.' (*Merriam* v. *Board of Supervisors,* 72 Cal. 519 [14 Pac. 137].) The case at bar is not one merely involving the findings of fact by a board with respect to a claim clearly chargeable against the county and within the jurisdiction of the board to allow or reject. In such a case, the conclusion of the board is final, and the auditor has no discretion to disregard it. Here the question is not one of fact, but whether or not the claim is in its nature one which the board had jurisdiction to allow. The mere introduction of the written claim which appellant presented to the board, with the indorsement of allowance, does not make a *prima facie* case. It does not show upon its face that it is a claim chargeable against the county, and, when viewed in the light of the complaint, the contrary appears.' (See, also, *Biggart* v. *Lewis,* 183 Cal. 660, at page 672 [192 Pac. 437, 442]; *Reclamation District* v. *Riley,* 192 Cal. 147 [218 Pac. 762]; *San Christiana Ins. Co.* v. *San Francisco,* 167 Cal. 762, 769, 770 [52 L. R. A. (N. S.) 676, 141 Pac. 384].)

"Or, as succinctly stated in the case of *Jack* v. *Taylor,* 24 Cal. App. 667, at page 670 [142 Pac. 121, 124] , 'The mere fact that the claim was allowed by the board would not invest it with a validity which it would not theretofore possess.'

"As already noted, it appears in this case that the ownership of the Fair Grounds property with all its improvements, valued at over two hundred thousand dollars, was vested in the County of San Joaquin, and the duty of the care and control thereof during the year 1924 was vested in the Board of Supervisors. Furthermore, the power and duty of the making of improvements thereon, together with the manner of proceeding thereunder, was by statute delegated as a trust by the people, through their legislature, to the Board of Supervisors. Section 4041, paragraphs 6 and 7, specifically provide that 'the boards of supervisors in their respective counties shall have jurisdiction and power, under such limitations and restrictions as are provided by law, to purchase, receive by donation, real or personal property necessary for the use of the county for . . . an exposition building, or buildings, public pleasure grounds, public parks, and other public purpose, . . . and to *improve,* preserve, take care of, manage and control the same . . . to construct . . . build or rebuild, furnish or *refurnish, or repair* exposition building or buildings for exhibition and advertising, farming, mining, manufacturing, livestock raising, and other resources of the country . . . and to provide all the necessary officers, employees, attendants and *supplies* for the maintenance of the same . . . Whenever the cost of construction of . . . exposition building or buildings, stadium or other public buildings, or the cost of any repairs thereto, or furnishing thereof, shall exceed the sum of five hundred dollars, such work shall be done by contract, and any contract thereof shall be void unless the same shall be let as herein provided.' Then follows specific directions touching plans, specifications and bids, and proviso that 'in counties employing a purchasing agent, that furnishings, materials and supplies used in the work mentioned in this subdivision, costing more than one thousand dollars, may be purchased by said purchasing agent, etc.' And also to the board of supervisors is delegated the trust 'to purchase, acquire, construct, equip and

maintain all necessary tanks, reservoirs, pumps, apparatus, motor vehicles and other machinery necessary or proper to facilitate the performance of the work in the county.' And, furthermore, by an amendment to this act passed by the legislature in 1909 [Stats. 1909, pp. 126, 756], by Subdivision 21 of said Section 4041, they were specially authorized by the people of the State to delegate a portion of their own heretofore delegated powers to the extent that they might employ a purchasing agent 'whose duty shall be to purchase for the county and the officers thereof . . . and all other supplies; to purchase machinery, implements, material, and all other personal property, material or supplies, the same to be purchased only upon a proper requisition therefor . . . '

"The foregoing being the powers delegated to the board of supervisors, it appears without conflict, and, in fact, by the direct testimony of the Manager of the Fair Association Corporation, as well as by the recitals in the Resolution of the Board of Supervisors of January 12, 1925, that all the expenditures which form the basis of the Fair Association's claim were made upon the initiative and judgment of the directors of such Association, and under the sole direction of their manager, as regards the determining of the amount thereof, the kind, character and extent thereof, as well as the cost thereof, and from whom and by whom purchased, and the manner and method of the purchase thereof, and that at no time and in no manner did the Board of Supervisors, acting as a Board, assume any control thereof, or exercise any discretion in regard thereto, or in any way assume any authority or control thereof, or by original resolution or otherwise, authorize or direct the activities of the Fair Association in regard thereto. And furthermore an examination of the many various items and the general subject matter of the claims, fully shows that the purchase of the articles set forth therein, and the making of the improvements shown by the testimony to have been made through the use of the labor and material set forth therein, comprised and consisted of, to the extent of every dollar thereof, improvements, repairs, furnishings and equipment upon county property which the law provides could be made only by the board of supervisors, and furthermore only by the supervisors by the use, in a legal

manner and under legal forms, of their own judgment and discretion. And furthermore it appears from the testimony touching the amount, nature, kind and character of the improvements made and personal property purchased, that the Court must find that the use and employment by the Board of Supervisors of their own discretion and sound judgment in the first instance, and on the very originating of this work, was one of the duties imposed by law upon the Board of Supervisors. ·That permeating the very spirit of our Government, so far at least as concerns municipal bodies, is the rule that officers to whom duties involving the use of judgment and discretion are allotted, must themselves use that judgment and discretion in the performance of their delegated trusts, and are themselves absolutely without power, under the law, to delegate to others the use of their own official judgment and discretion. In other words, for better or worse, the people are entitled to the services of their chosen servants to be exercised in the manner and to the full extent of their employment under the law. Consequently, to put the matter concretely, it would seem, as shown by the testimony herein, that the ways and means and purposes of the expenditure during the year 1924 (principally in the county's Fair Grounds) was a matter that in its details of planning, purchasing and managing involved the exercise of judgment and discretion, and of a judgment and discretion of the kind and character pre-eminently and unquestionably possessed by a board of supervisors, and its own ministerial agent. It appears that these expenditures, were not made by the people's delegated servants or trustees, but were made by others who had accepted, by their own implication, an assumed delegation from servants who under the law had no right or power to give such delegation.

"It is a canon of law, as well as of common sense, that a subsequent ratification cannot give validity to an act or a conduct which, in the first instance and in its inception, was without validity, or, as stated in our Civil Code (Section 2312), 'a ratification is not valid unless at the time of ratifying the act done the principal has power to confer authority for such an act.' Now, as already indicated, the act which the Resolution of January 12, 1925, seeks to ratify, is the act of the Fair Association (in every respect

public-spirited, disinterested, and well-intentioned, it may
be assumed) in accepting—and that by implication only—
a direction from the Board of Supervisors to use their own
judgment and discretion in devising, planning, executing
and paying for certain improvements on county property,
and in the selection, bargaining for and purchasing of
furnishings—all in the sum of about fifteen thousand dol-
lars. And that such was the act sought to be ratified is
shown not only by the testimony, but is not in conflict with
the recitals in the Resolution of January 12, 1925. . . .

''Now, it may be conceded (without reference to any
questions involving advertising or the use of the Purchasing
Agent), as contended by learned counsel, that the Board
did, as a matter of fact, have authority under the statute
to have in the first instance planned and carried out this
work, and to have made all the expenditures that were
made. But from this it does not follow, in law or in fact,
that the Board had the power to do the act indicated above,
and which the Resolution itself of January 12th, clearly
implies was done; which act was an attempted unlawful
vesting in an unofficial body of the judgment and discretion
vested in and delegated by the law to the Board of Super-
visors. Also learned counsel placed some reliance upon
language used by Justice Henshaw in the case of *Power* v.
*May*, reported in 114 Cal. 207 [46 Pac. 6], and 123 Cal.
147 [55 Pac. 796]. That was a case where an attorney-at-
law applied for a writ of mandate against the Treasurer
of Tulare County to pay his claim based upon professional
services rendered by him to the County. It was conceded in
that case that the county had, in the first instance, power
under the law to employ an attorney to render his pro-
fessional services. And it further appeared that the only
informality in regard to his employment (in addition to
some matters of fraud and collusion which were afterwards
satisfactorily explained) was 'that there was no previous
formal resolution of the Board authorizing plaintiff to
perform services; that there was an understanding to that
effect, which for some unexplained reason was not entered
upon the minutes of the Board.' And it was in reference to
this informality that the following language relied upon by
counsel was used by the Court: 'Can the board of super-
visors legally allow a claim for the beneficial use of money,

546

labor, or property, although the formalities necessary to bind the county have not been employed? Without entering into an elaborate consideration of this question, it is sufficient to say that this may at times, and under certain circumstances, be done, provided the power to do so be not withheld in the grant of powers to the board, and provided further that the service has been bestowed, or the money expended, for the benefit of the county in a manner authorized by law. Under such circumstances, if the board had original power in the premises, it may cure informalities or irregularities in procedure by the subsequent ratification and recognition of its liability.' (114 Cal. 208 [46 Pac. 7].)

"And in the final decision of the case the Court disposed of the matter in the following language: 'While in all matters of such importance we think the board should act formally by resolution spread upon the minutes, still, as they had the power to act and the services were performed, and the board did in fact subsequently approve the bill for the services and order it paid, we know of no reason why the subsequent ratification and order of payment should not be treated as equivalent to previous authority regularly given.'

"But, as already noted in the case at bar, there was neither any original contract of employment, nor was the act sought to be ratified anything more than an implied delegation, at the most, of authority to the claimant to give employment in the use of its discretion to other people. And therefore, in principle, the case at bar should not be governed by the case cited; but the doctrine applied in the later case of *Knight* v. *City of Eureka*, 123 Cal. 194 [55 Pac. 769]. That also was a case where an attorney-at-law brought suit against a municipality to recover compensation for professional services of concededly high value and benefit to the city. But in that case the claimant was not obliged to rely upon mere ratification of a previous contract of employment. He was able to rely upon a resolution of the council which was passed before he accepted the employment or entered upon the duties thereof, and it was conceded in that case also that the city had authority, if properly exercised, to initiate the employment, and to be obliged to pay therefor. But in that case the resolution

upon which the attorney relied was a resolution by which the council authorized and directed its own city attorney, with whom it had a contract, to employ such San Francisco counsel as he might deem necessary. In other words, the resolution upon which the attorney relied failed to show that the council made use of its own judgment and discretion in exercising its legal power to employ counsel, but delegated the use of that judgment and discretion to another party; just as in the case at bar, if it be assumed that there was any direction given to the claimant here which can be the basis of any implied contract, it was a direction which was a mere delegation of the use of the Board's own judgment and discretion in the placing of permanent improvements on the county's property, and the purchasing of necessary furnishings therefor.

"Also, in deciding the case, the Court enunciated and relied upon basic principles of law which it would seem are specially applicable in the case at bar, the following being some of the language used:

" 'Practically, the authority here delegated left with the agent of the council the discretion to determine the necessity for employing an assistant and to fix his compensation. These were the powers which, in our opinion, the council alone could exercise, and therefore, could not be delegated.'

"We think the true doctrine is correctly stated by Mr. Dillon at Section 96: 'The principle is a plain one, that the public powers or trusts devolved by law or charter upon the council or governing body, to be exercised by it when and in such manner as it shall judge best, cannot be delegated to others.' (123 Cal., at pages 194, 195 [55 Pac. 769].)

"And furthermore, if it is contended that the implied direction given to the claimant herein was not, in effect, as the facts seem to indicate, a mere attempted delegation of authority, but was a direct employment of the Fair Association Corporation to itself do the work, then and in that event, it is evident that such act of implied direct employment failed absolutely to come within the rules laid down by the statute for the guidance and control of the Board of Supervisors in the letting of contracts or the making of purchases involving such a large sum as fifteen thousand dollars, and pertaining to the kind and character of the

permanent improvements assumed to have been contracted for herein.

"Section 4056b and Subdivision 33 of Section 4041 of the Political Code are intended simply to give the Board power to levy taxes for the purposes indicated therein, to-wit: to advertise, exploit and make known the resources of the county, etc., and to create a fund to be used for collecting, preparing and maintaining an exhibit of the products and industries of this county at any domestic or foreign exposition for the purpose of encouraging immigration. But it is to Subdivision 7 of Section 4041 that we must look when we desire to ascertain the conditions and limitations under which the Board of Supervisors must act when they desire to exercise their powers in the way of making permanent improvements and refurnishing of the kind in the case at bar. By the Amendment of 1923 there was specially included in Subdivision 7 matters pertaining to the rebuilding, furnishing or refurnishing of 'exposition building or buildings for exhibiting and advertising farming, mining, manufacturing, livestock raising and other resources of the county, stadium, and such other public buildings as may be necessary to carry out the work of the County government and supplies for the proper maintenance of the same.' It therefore follows that the doing of the work by the Supervisors for which compensation is sought herein, could only be done under the restrictions touching plans, specifications and bids laid down in Subdivision 7.

"Likewise, as regards the acquiring of the personal property if it be assumed that the property was acquired directly from the claimant here, and not as the result of any delegation of authority to the claimant, then such acquisition should have been had through the purchasing agent designated by the legislature in Subdivision 21 of the Act."

In addition to the foregoing, we may add, quoting the language of the text-writer, in 18 Cal. Jur., page 1002, section 273:

"It is generally recognized that *ultra vires* contracts of a municipal corporation are absolutely void, and cannot be the subject of ratification or estoppel *in pais*. And the decided weight of authority is to the effect that when, by charter or statute, the mode in which contracts of a municipal corporation may be entered into is prescribed, and any other

method is expressly or impliedly prohibited, no contract will be binding unless made in the specified mode; the mode in such cases constitutes the measure of the power."

The citations set forth as supporting this statement of the law are too copious to be here inserted. And further upon the same subject, we may quote from 7 Cal. Jur., page 512, section 86:

"Inasmuch as a county has power to make only such contracts as are expressly authorized or such as may be necessary to the exercise of its powers, it follows that any contract made in excess of this power is *ultra vires* and therefore void. . . . Also where duties are enjoined by law upon county officers specially designated for their discharge, the board of supervisors is entirely without authoritly to contract with private parties for their performance," citing a number of authorities.

The entire transcript in this case shows that the board of supervisors delegated its authority to a private corporation, even if we assume that it had authority to expend the money in the first instance. In making this statement, we must disregard what we have heretofore said, that the transcript shows no compliance with the law relative to the raising of money for the purposes of holding a county fair. That boards of supervisors may not delegate the performance of acts involving an exercise of judgment or discretion, see, also, 15 Corpus Juris, 465; Mechem on Agency, 2d ed., p. 84, par. 124.

We see no escape from the conclusion that the board of supervisors had no authority to delegate to the San Joaquin Fair Association, a private corporation, the performance of the acts which it did perform so as to render the county liable for any deficiency between the receipts and expenditures of such private concern in the handling of a county fair. Having no authority to make the delegation, the ratification is absolutely void.

The judgment of the trial court is affirmed.

Glenn, J., *pro tem.*, and Finch, P. J., concurred.