[S. F. No. 6290.   Department Two.—June 2, 1914.]

SAN CHRISTINA INVESTMENT COMPANY (a Corporation), Appellant, v. CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation), Respondent.

MUNICIPAL CORPORATION—SUSPENSION OF TAX LIMIT IN SAN FRANCISCO—UNANIMOUS VOTE OF SUPERVISORS.—The provision in the charter of San Francisco that the suspension of the "dollar limit" of taxation in case of great necessity or emergency can be done only "by the unanimous vote of the supervisors," does not require, for such suspension, the unanimous vote of all the supervisors constituting the board, but only the unanimous vote of all who are actually present at the meeting.

ID.—TAXES PAID UNDER PROTEST—ACTION TO RECOVER—PLEADING—
LEGAL CONCLUSION.—In an action to recover taxes paid under pro-
test because in excess of the "dollar limit," an allegation "that no
great emergency or necessity existed so as to authorize all or any
part of said extra tax levy," is good as against general demurrer,
although it would be subject to special demurrer as the pleading
of a legal conclusion.

ID.—SUSPENSION OF TAX LIMIT BY SUPERVISORS—REVIEW OF ACT BY
COURTS.—The existence or nonexistence of a great necessity or
emergency, justifying the temporary suspension of the "dollar limit"
of taxation in San Francisco, is a question of fact, and a finding of
the existence of such fact is a prerequisite to the right of the super-
visors to suspend the limit, but their determination of the question is
not final, but is subject to review by the courts.

ID.—INTERMINGLING OF ITEMS IN TAX LEVY—QUESTION FOR TRIAL
COURT.—The question whether such an emergency levy embraces
some purposes which are not emergency or necessity purposes so as
to invalidate the levy, calls for first consideration by the trial court,
and is not for determination on appeal from a judgment sustaining
a demurrer to the complaint in an action to recover taxes paid under
protest.

ID.—MEANING OF WORD "GREAT."—The use of the word "great" in the
charter of San Francisco, providing for the suspension of the "dollar
limit" of taxation in "any great necessity or emergency," means a
necessity or emergency of grave character and serious moment.

ID.—DEFINITION OF "EMERGENCY."—"Emergency" means "an unforseen
occurrence or combination of circumstances which calls for an im-
mediate action or remedy; pressing necessity, exigency."

ID.—TERMS OF CITY CHARTER—WHETHER MAY BE IGNORED IN CASE OF
HARDSHIP.—No argument of hardship or inconvenience will justify
a court in setting at naught the written terms of a city's charter,
even at the instance of the city's officials.

ID.—INFERIOR BOARD OR TRIBUNAL—JURISDICTION—CONCLUSIVENESS OF
DETERMINATION.—When the power or jurisdiction of an inferior
legislative tribunal is made to depend upon the existence of a fact,
its determination of the fact is not conclusive unless declared to be
so in express terms or by necessary implication.  And if so declared
to be conclusive, the declaration or finding can operate to bind the
citizen whose property is affected thereby, only in the event that
at some stage of the proceedings he shall have been afforded an
opportunity to be heard on the question, in short, shall have had his
day in court.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco.  J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Cushing & Cushing, for Appellant.

J. P. Langhorne, *Amicus Curiae.*

Percy V. Long, City Attorney, and Jesse H. Steinhart, Assistant City Attorney, for Respondent.

HENSHAW, J.—This is an action brought to recover taxes paid under protest for the asserted illegality and invalidity of the tax levy. A general demurrer to the complaint was sustained, and from the judgment which followed plaintiff appeals.

Chapter I, article III, section 11 of the charter of the city and county of San Francisco, contains a restriction upon the general grant of the taxing power to the municipality, which restriction is widely and popularly known as the "dollar limit." This section excluding from its limitation certain defined taxes, declares that the annual levy "shall not exceed the rate of one dollar on each one hundred dollars valuation of the property assessed." Section 13 of the same article and chapter is as follows:

"The limitation in section eleven of this chapter upon the rate of taxation shall not apply in case of any great necessity or emergency. In such case the limitation may be temporarily suspended so as to enable the supervisors to provide for such necessity or emergency. No increase shall be made in the rate of taxation authorized to be levied in any fiscal year, unless such increase be authorized by ordinance passed by the unanimous vote of the supervisors and approved by the mayor. The character of such necessity or emergency shall be recited in the ordinance authorizing such action, and be entered in the journal of the board. . . ."

In 1910, in preparing the tax levy for the fiscal year 1910–11, the supervisors, acting under the authority of section 13, passed two ordinances. Sections 1 and 2 of the first are as follows:

"Section 1. It is hereby recited, determined and declared that a great necessity and emergency exists within the city and county of San Francisco, which requires that the limitation of taxation contained in section 11, chapter I of article III of the charter of said city and county be temporarily sus-

pended, and that the character of such necessity and emergency is as follows, to wit:

"On the 18th day of April, 1906, a large number of the public buildings, and other structures, and much of the fire department equipment of said city and county were destroyed by fire, and on said day a large extent of the public sewers of said city and county were damaged and destroyed by earthquake; that a large extent of the public streets of said city and county were damaged by the combined effects of fire and earthquake; also there is danger that the bubonic plague, prevalent in 1907, may recur and provision should be made to prevent such recurrence; that it has been impossible to pave, repave, and repair streets, reconstruct and repair sewers, construct and repair the public buildings destroyed and damaged as aforesaid in April, 1906, from the appropriations heretofore made, and the great necessity and emergency hereby declared to exist has not been adequately provided for by previous tax levies made by the board of supervisors.

"Section 2. That by reason of the great necessity and emergency, herein set forth, large sums of money will be required to be expended by the city and county during the fiscal year ending June 30, 1911, for the paving, grading, repaving, and repairing of streets, for the reconstruction and repair of sewers, construction of and repairs to public buildings, for construction and equipment of fire department buildings, for the purchase of lands for fire department buildings, for the reconstruction of, repairs to, and equipment of school department buildings, for the construction and equipment of police department buildings, and for the purchase of lands for police department purposes, and for the continuation and enforcement of sanitary measures. That the large sums required for the aforesaid purposes cannot be obtained from the annual income and revenue of the city and county, and said necessary expenditures cannot be made without temporarily suspending the limitation upon the rate of taxation provided for in section 11 of chapter I of article III of the charter of said city and county."

The ordinance further declared that for the assigned reasons the provisions of section 11 (*supra*) of the charter were therefore suspended, and an additional tax levy of twenty-nine cents upon the hundred dollars was authorized and de-

clared necessary, the moneys derived from such tax being segregated for named purposes.

The second ordinance formally levied the tax. The purposes and amounts were thus set forth:

> "For paving, repaving, grading and repairs to streets, for reconstruction of and repairs to sewers, and for construction and repairs to public buildings and other structures, except school buildings,    22    cents
>
> "For construction and equipment of fire department buildings, and for purchase of lands for fire department purposes,    2½   cents
>
> "For reconstruction and repairs to and equipment of school department buildings,    2    cents
>
> "For construction and equipment of police department buildings, and for purchase of lands for police department purposes,    2    cents
>
> "For continuance of sanitary measures,    ½. cents."

The plaintiff in its protest and in its complaint presented three grounds of attack against the validity of the tax levy under this ordinance, which may be thus stated:

(a) The ordinance suspending the operation of section 11 was not passed in accordance with the requirements of the charter.

(b) No "great necessity or emergency" justifying the suspension of section 11 in fact existed; and

(c) A large part, if not all, of the revenue to be raised by the levy was, upon the face of the ordinance, to be devoted to objects and purposes which were not emergency or necessity purposes.

These questions may be taken up in the order indicated, for clearly if the ordinance was not legally passed there is an end at once put to the whole controversy.

(a) Appellant here contends that the people of San Francisco in adopting their charter, and the legislature in ratifying it, limited the power of the board of supervisors with great rigidity to the "dollar limit" and authorized the suspension of this limit and the levying of an additional tax

with extreme reluctance and with equal care. It could be done not even in the case of necessity or emergency, but only in the case of a *great* necessity or emergency, and then it could be done only "by the unanimous vote of the supervisors," which should be construed under these considerations to mean the unanimous vote of *all* the supervisors. It is argued that if the word "supervisors" as here used is to be interpreted as synonymous with "board of supervisors" under chapter I, article XX, section 1 of the charter, which declares that the legislative power of the city and county is vested in a body designated the board of supervisors, but that "such body is also designated in this charter, the supervisors," it would amount to a declaration that such an emergency tax could be laid and levied by a bare quorum of the board—by ten members—whereas by inspection of other charter provisions it will be seen that in matters of far less consequence a greater number of votes is required. Thus, to pass an ordinance over the mayor's veto requires "the affirmative vote of not less than fourteen members." (Chap. I, art. I, sec. 16.) The vote of the same number is required to extend the time on a contract or to authorize the purchase of property for public works. (Chap. I, art. VI, sec. 21; and chap. IV, art. VI, sec. 6.) Fifteen votes are required to lease school property. (Chap. IV, art. VII, sec. 11.) To grant a franchise the vote of three-fourths of all the members of the board is required, or fourteen, and to pass a franchise over the mayor's veto a vote of five-sixths of all the supervisors is required—a vote of fifteen. (Chap. II, art. II, sec. 6; subd. 6, sec. 36.) To pay any money out of the urgency necessity fund a five-sixths vote of all the members is required. (Chap. I, art. III, sec. 8.) But these citations rather destroy than confirm appellant's contention. It becomes apparent that the charter in these particulars was framed with careful attention to the language employed, and that in every other instance there can be no ambiguity or doubt as to the actual number of votes required to accomplish a given purpose. We find, moreover, that in every instance save one the phrase "the supervisors" is used interchangeably in meaning with "board of supervisors," as the charter itself expressly declares it will do. The one exception to that is found in article II, chapter II, section 36, subdivision

6, which declares: "It shall require a vote of five-sixths of all the supervisors to pass an ordinance, notwithstanding the objections of the mayor." There can be no doubt whatsoever of the meaning of this language and there can be no successful answer to the declaration of the respondent that if in the section under consideration the charter had meant the unanimous vote of *all* the supervisors it would have said so, as it did say in the less important section just quoted. Moreover, good and sufficient reasons appear why the charter framers deemed it wise not to require the unanimous vote of all of the supervisors. Those reasons at once occur to the mind. Their action was to be called forth, and could properly be called forth, only in case of great necessity or emergency. It might well be that in such a case it would be difficult, if not impossible, to assemble all of the members of the board, and a perilous and perhaps calamitous delay might result. Upon the other hand, the interests of the taxpayers were amply guarded by the provision that the suspension could not take place except by the unanimous vote of all present. Therefore if the attempted suspension was in fact unwarranted, the voice of one member of the board raised in protest and voting in the negative would defeat the scheme. Indeed it is the single instance presented by the charter where one dissenting vote will block legislation. Wherefore, it appearing from the complaint itself, that seventeen out of the eighteen supervisors (all of the board who were actually present) voted for the ordinance and there being no dissenting vote, the ordinance was duly adopted within the meaning and provisions of the charter, and the demurrer to the complaint on that ground was properly sustained.

(b) Herein appellant contends that the existence or non-existence of a great necessity or emergency justifying the temporary suspension of the dollar limit is a question of fact; that a finding of the existence of this fact is a prerequisite to the right of the supervisors to suspend the limit, but that their determination in this respect is not final and is subject to review by the courts. The position of respondent is that the finding of the board of supervisors, entered upon the journal of the board, is conclusive upon all courts. In this connection respondent also advances a minor argument, to the effect that appellant fails sufficiently to deny the exist-

ence of the great necessity or emergency, its denial being couched in the following language: "That no great emergency or necessity existed so as to authorize all or any part of said extra tax levy." It is asserted by respondent, and with force, that this is but the pleading of a legal conclusion. Unquestionably if a special demurrer had been directed to this imperfection in the complaint the point would have been well taken. But against a general demurrer it will be held, as it was in *Eva* v. *Andersen*, 166 Cal. 420, [137 Pac. 16], that the allegation is sufficient.

Returning to the principal proposition now under consideration, respondent's position is that the supervisors were empowered to make a determination of the existence or nonexistence of the necessity; that their determination here made was a legislative determination and that it is fundamental that such determinations upon questions of fact are not subject to judicial review. The cases which respondent cites in support of this proposition are cases where the determination was by the general legislature. Where an act of the legislature is brought up for review the rule is that announced by respondent. The principle is this: The legislative determination of a fact is conclusive upon the courts. Where evidence is required to be taken it will be conclusively presumed that the legislature acted after the taking of such evidence, and even if a special finding of fact be required the legislative enactment will be construed to contain such finding by implication. The question has received recent consideration from this court in *People* v. *Sacramento Drainage District*, 155 Cal. 373, 386, [103 Pac. 207]. In *Stevenson* v. *Colgan*, 91 Cal. 649, [25 Am. St. Rep. 230, 14 L. R. A. 459, 27 Pac. 1089], in the discussion of this question and of the dignity which attaches to the legislative determination, it is said: "This view seems to be sustained by the decisions of the highest courts of other states, and is in harmony with the central idea of the constitution in prescribing the independence and equality of the three great departments of the state." But neither the reasoning nor the rule applies to the acts of inferior legislative tribunals. As to them it may be said, generally speaking, that when the power or jurisdiction of such an inferior board, body, court, or other tribunal is made to depend upon the existence of a fact, its determination of the

fact is not conclusive unless declared to be so in express terms or by necessary implication. And if so declared to be conclusive, the declaration or finding can operate to bind the citizen whose property is affected thereby, only in the event that at some stage of the proceedings he shall have been afforded an opportunity to be heard on the question; in short, shall have had his day in court. Otherwise there is a clear taking of property without due process of law. For it is of the essence of due process of law in such cases that a man shall be accorded the right and opportunity to be heard and to be heard effectively at some stage of the proceedings before he is deprived of his property or property rights. So we find that the principle which accords the great dignity of conclusiveness to determinations of the general legislature (and it is these determinations which respondent cites in support of its position) is not only not applied to the proceedings of inferior legislative tribunals, but is distinctly held to be nonapplicable. Thus in *Spring Valley Water Works* v. *San Francisco,* 82 Cal. 286, [16 Am. St. Rep. 116, 6 L. R. A. 756, 22 Pac. 910, 1046], it is said: "We are not inclined to the doctrine asserted by the appellant in this case, that every subordinate body of officers to whom the legislature delegates what may be regarded as legislative power thereby becomes a part of the legislative branch of the state government and beyond judicial control." And in *Davis* v. *Mayor of New York,* 4 Duer (N. Y.), 451 (affirmed in *People* v. *Sturtevant*), 9 N. Y. 263, [59 Am. Dec. 536], it is said: "The doctrine, exactly as stated, may be true when applied to the legislature of the state, which, as a co-ordinate branch of the government representing and exercising in its sphere the sovereignty of the people, is, for political reasons of manifest force, wholly exempt in all its proceedings from any legal process or judicial control; but the doctrine is not, nor is any portion of it, true when applied to a subordinate municipal body, which although clothed to some extent with legislative and even political powers, is yet, in the exercise of all its powers, just as subject to the authority and control of courts of justice, to legal process, legal restraint, and legal correction, as any other body or person, natural or artificial." The rule of decision holding that the determination of a municipality of the necessity or expediency of exercising the right of eminent

domain against a given piece of land is conclusive upon the courts is neither in conflict with nor an exception to the principle we have been discussing. First, because the exercise of the right of eminent domain is essentially a political question and not judicial (Dillon on Municipal Corporations, 5th ed., sec. 1036), and, second, because the property owner is in no sense legally injured by such determination, since he receives full value for his property thus taken for a public use. We are here dealing with the taxing power, proceedings in which are always *in invitum*—a power which, when exercised under delegated authority by a municipal corporation, is always subject to rigid scrutiny: 1. To determine whether the power actually exists; and, 2. To determine whether it has been exercised under the limitations imposed. For, says Sutherland, treating of acts delegating the power of taxation: "Acts of this kind are construed with great strictness. Two concurring principles leading to strict construction apply. Such acts affect arbitrarily private property, and are grants of power." (2 Lewis Sutherland on Statutory Construction, sec. 541. See, also, *Douglass* v. *Mayor of Placerville,* 18 Cal. 643; *Wallace* v. *Mayor of San Jose,* 29 Cal. 181; *Wichman* v. *City of Placerville,* 147 Cal. 162, [81 Pac. 537].) Finally, upon this proposition, reference may be made to the consideration given to it by the supreme court of Washington in two cases, *Green* v. *Okanogan County,* 60 Wash. 309, [111 Pac. 226, 114 Pac. 457], and *Stern* v. *Spokane,* 60 Wash. 325, [111 Pac. 231]. In the first of these cases the law forbade the letting of a contract without competitive bidding "except in case of an emergency." Under this provision the court examined into the facts and made its determination contrary to that of the supervisors of Okanogan County that the emergency did not exist and that competitive bids were therefore required. In the second case the charter of Spokane contained the provision dispensing with competitive bidding "if the mayor and city council shall by resolution declare an emergency to exist." The mayor and city council did so declare and the court expressed its inability to review that declaration in the following language: "That which the legislature can give it can take away; and while we agree with counsel for appellant that, if the action of the council in declaring an emergency to exist be upheld, it practically

nullifies those provisions of the charter which were designed to insure open competition in the matter of letting contracts for public works, we must nevertheless hold that it can be no concern of the courts if it does. If the legislature passes a wholesome law and at the same time creates a weapon to strike it down, it is still within the limits of its constitutional authority, as much so as if it had repealed an existing statute by express enactment. It is so in this case. The charter does not say that time may be dispensed with if an emergency exist, thus leaving the court free to inquire into the fact, but it says that the council shall have the power under any state of facts to declare an emergency. . . . This case is to be distinguished from *Green* v. *Okanogan County,* 60 Wash. 309, [111 Pac. 226, 114 Pac. 457], wherein we held that no emergency existed which would warrant the board of county commissioners in letting a contract without inviting open competition. The provision of the law there construed (Laws 1903, p. 226, sec. 15) is that all work shall be let to the lowest bidder, 'except in case of emergency'; but no authority is given the board of county commissioners to declare the emergency as a matter of legislative discretion, thus leaving the court free to inquire into the facts.''

In the light of these fundamental principles we come to the immediate question: Does the charter of San Francisco in terms or by necessary implication make the determination of the supervisors as to the existence of a great emergency or necessity conclusive? Manifestly it does not. The language of the charter is not that the dollar limit may be suspended upon the declaration of the supervisors that a great emergency or necessity exists. It is that this limit may be suspended ''in case of'' (the existence of) ''any great necessity or emergency.'' Moreover, and as persuasive to this view, even were it not so plain as it appears, is the added fact that the supervisors are required to spread upon the journal ''the character of such necessity or emergency.'' If their determination was to be conclusive, this recital in their journal would be meaningless. It can have significance and value only in contemplation that the determination of the board is subject to review. It is therefore concluded that the complaint in this regard states a cause of action, and the general demurrer to it was improperly sustained.

(c) Appellant analyzes and tabulates the tax levy as follows:

> "Paving and grading streets is included with other purposes for which, in all, $1,112,000 was to be raised by a levy of     22     cents
>
> "Purchasing lands for fire department purposes was included with other purposes for which, in all, $127,500 was to be raised by a levy of     2½ cents
>
> "Purchasing lands for police department purposes was included with other purposes for which, in all, the sum of $102,000 was to be raised by a levy of     2     cents

> "Making a total of $1,351,500, which was to be raised by a levy of     26½ cents."

Appellant contends, first, that some of the purposes are clearly not emergency or necessity purposes, and that they are so commingled and intermingled in the levy with other purposes, which may conceivably be emergency or necessity purposes, as to render invalid the tabulated twenty-six and a half cents of the twenty-nine cents levy. This question, however, calls for first consideration by the trial court. We need here go no further than to say that by the use of the adjective "great" the charter plainly means a necessity or emergency of grave character and serious moment. Webster's International Dictionary defines "emergency" as "An unforeseen occurrence or combination of circumstances which calls for an immediate action or remedy; pressing necessity, exigency." This definition is approved in *People* v. *Lee Wah,* 71 Cal. 80, [11 Pac. 851]. It is the meaning of the word that obtains in the mind of the lawyer as well as in the mind of the layman. It was not in contemplation that the supervisors could foster and nurse such an emergency so as to spread their taxing power over an undetermined number of years. As little was it designed that under the head of emergency or necessity should be imposed taxes not bearing forcefully and directly on the relief, cure, or prevention of this emergency or necessity. Recalling once more to mind the fact that the exercising of the taxing power, for the reasons already given, is subject to strict construction, the

trial court will scrutinize the items presented; first, to determine whether or not the great emergency or necessity, within the meaning of the charter, existed at the time of the levy, and second, whether, if it be found that such emergency or necessity did in fact exist, any of the items in the levy do not fairly come within the purport and scope of such emergency levy.

And, finally, it must be said that no argument of hardship or inconvenience will justify a court in setting at naught the written terms of a city's charter, even at the instance of the city's officials. As was said by this court in *Connelly* v. *City of San Francisco*, 164 Cal. 101, [127 Pac. 834], "an inconvenience to the city does not justify the despoiling of its taxpayers." If these large revenues sought to be raised by the city do not fairly come within the purview of an emergency tax measure it is for the city to meet the desired end either by the issuance of bonds or by an amendment to its charter. It is not for the courts themselves to amend this charter by striking therefrom any of its salutary and protective provisions.

The judgment appealed from is therefore reversed, with directions to overrule the demurrer and permit defendant to plead.

Lorigan, J., and Melvin, J., concurred.

Hearing in Bank denied.