[Civ. No. 12944. First Dist., Div. One. June 26, 1946.]

DANIEL J. MULLINS et al., Respondents, v. WILLIAM L. HENDERSON et al., Defendants; WILLIAM PETROS, Intervener and Appellant.

118

James C. Purcell and William E. Ferriter for Appellant.
Walter McGovern for Respondents.

KNIGHT, J.—Plaintiffs petitioned the superior court for a writ of mandate to be directed to various officers of the city and county of San Francisco requiring them to comply with the terms of a series of three proclamations issued by the mayor of San Francisco in the exercise of the emergency powers conferred upon him by section 25 of the city charter, which so far as here involved reads: ''In case of a public emergency involving or threatening the lives, property or welfare of the citizens, or the property of the city and county, the mayor shall have the power, and it shall be his duty, to summon, organize and direct the forces of any department in the city and county in any needed service; to summon, marshal, deputize or otherwise employ other persons, or to do whatever else he may deem necessary for the purpose of meeting the emergency. . . .''

In response to the alternative writ that was issued, one group of four defendants, consisting of the secretary and executive officers of the Civil Service Commission, and three members of the commission, being represented by their own attorney, joined in filing one answer to the petition; and the remaining defendants, being represented by the city attorney, joined in filing a separate answer. Prior to the commencement of the trial William Petros asked for and was granted leave, as a taxpayer and resident of the city, to file a complaint in intervention and an answer to the petition; and the attorneys representing him took an active part in the trial and introduced much evidence in opposition to the issuance of the writ. The principal issue tried was whether the action taken by the mayor pursuant to the emergency powers conferred upon him by section 25 of the charter was justified by the grave conditions existing at that time. The trial extended over a period of approximately two weeks, and shortly after it concluded the trial court rendered its decision upholding the action of the mayor in every particular; whereupon it directed the issuance of a permanent writ. The intervener alone has appealed.

For many years there were two major transportation systems operating streetcars and bus lines within the city. One was the Market Street Railway Company, a privately owned company, and the other the San Francisco Municipal Railway System. At an election held on May 16, 1944, the electorate adopted a charter amendment numbered 119.1, which called for the extension of the municipal system by the ac-

quisition of the operating properties of the Market Street company for a sum not exceeding seven and a half million dollars, payable as follows: Two million dollars to be paid forthwith out of the surplus earnings of the municipal lines, then on hand, and the balance to be paid thereafter in installments out of the earnings of the unified systems. Shortly after the election a contract of purchase was entered into between the city and the Market Street company to be consummated on September 29, 1944; and as will hereinafter be shown, the emergency powers granted by section 25 of the charter were invoked and proclamations were issued during the months of August and September, 1944, when the world war was in its most critical stage, in order to prevent a shut down of the Market Street Railway system which the city had acquired and was about to take over pursuant to the mandate of the electorate of the city as expressed at the election on May 16, 1944. However, about August 1st it was ascertained that about 90 per cent of the employees of the Market Street system intended to terminate their employment as such and obtain outside employment because under the provisions of existing salary ordinances they would have to start in with the city at beginner's pay, which was much less than they were then receiving from the Market Street company; also considerably less than was paid to the Municipal Railway employees based on the same length of service, and far less than they would receive from outside employments. Upon learning of this critical situation the mayor held numerous conferences with the representatives of the Market Street Railway employees, the city controller, the city administrator, the city attorney, the manager of public utilities, the vice president of the Market Street Railway Company, and others; and as a result of these conferences and in order to retain the services of the Market Street employees and thus prevent a shut down of the Market Street system, the mayor issued his proclamations under the emergency powers granted him by section 25 of the charter.

The first proclamation was issued on August 8, 1944; this was followed on August 21st by a supplemental proclamation in almost identical language, and on September 18th, to clarify the situation, the mayor issued the third proclamation, a copy of which is attached to the petition for the writ. It directed, among other things, that all employees of the operating system of the Market Street company who possessed charter

qualifications be blanketed into the city service; that they be paid out of the revenues of the consolidated railway system the same compensation then being paid to Municipal Railway employees, and that they be granted equal seniority rights with Municipal Railway employees; that is to say, that service with the Market Street company should be deemed service with the city in determining runs and compensation under the compensation fixed for like service with the city. In view of the mayor's proclamations most of the Market Street employees entered the city service on September 29th when it took over the Market Street system. However, some of the city officers having charge of such matters declined to carry out the terms of the proclamations until the action taken by the mayor was favorably passed upon by the superior court; whereupon plaintiffs, in behalf of themselves and a great many other platform workers and bus operators formerly in the employ of the Market Street company brought the present proceeding. Two "time rolls" have since been kept, one on the basis of beginner's pay, and the other on the basis of "parity" pay; the former Market Street employees being paid the "beginner's" pay, and the difference being impounded, to be paid if this judgment becomes final.

The question as to whether the existing conditions shown by the evidence justified the action taken by the mayor pursuant to the emergency powers granted by the charter was and is one of fact to be determined by the trial court. At the oral argument on appeal counsel for appellant expressly so conceded, and the following cases definitely so held. (*Spreckels* v. *San Francisco,* 76 Cal.App. 267 [244 P. 919]; *San Christina etc. Co.* v. *San Francisco,* 167 Cal. 762 [141 P. 384, 52 L.R.A.N.S. 676]; *Josselyn* v. *San Francisco,* 168 Cal. 436 [143 P. 705].) Therefore, under the long established rule governing reviewing courts in dealing with fact cases, if the evidence on that issue is conflicting, or if not conflicting the evidence is such that fair and impartial minds may draw different conclusions therefrom, the conclusions drawn by the trial court are conclusive on appeal. (*Spreckels* v. *San Francisco, supra,* citing numerous cases.)

The trial court's decision herein contains complete findings of fact, which sustain generally all of the material allegations of the petition and negative the vital allegations of the complaint in intervention and the intervener's answer to the petition for the writ; and in upholding the legality of the

action of the mayor in the exercise of the emergency power conferred upon him by said section 25 the trial court found as conclusions of law that continuously from and after August 21, 1944, there existed in San Francisco an actual public emergency involving the lives, property and welfare of its citizens, as well as property of the city, and that such emergency directedly affected the streetcar transportation system of the city; and that on account of such conditions the action taken by the mayor in declaring the emergency and issuing the proclamations was and is a reasonable and necessary exercise of his powers as mayor, and constituted a reasonable exercise of his public duties and power as mayor under the Charter of the City and County of San Francisco.

The evidence, beyond question, supports the trial court's decision. In addition to the facts hereinabove set forth, the evidence establishes the following: At the time the city voted to acquire the Market Street system there were 1,029 platform personnel in the operative service of that company who were eligible to become permanent civil service employees under section 125 and other charter requirements. Section 125, which became effective in January, 1941, provided in part: "All persons employed in the operative service of any public utility hereafter acquired by the city and county, at the time the same is taken over by the city and county, and who shall have been so employed for at least one year prior to the date of such acquisition, shall be continued in their respective positions and shall be deemed appointed to such positions, under, and entitled to all the benefits of, the civil service provisions of this charter; provided, however, that no person who is not a citizen of the United States shall be so continued in or appointed to his position." The 1,029 platform men above mentioned had been in the service for more than a year; they were citizens and residents of San Francisco, and under 70 years of age. Section 145.1 of the charter provided that employees who were unable to meet the charter qualifications —those over 70; those who had not been employed for a year; those who could not meet the residence requirements— would become "limited tenure" employees, for the duration of the war and six months thereafter. There were 496 employees who came in as limited tenure employees, including 25 who were over 70.

However, on March 20, 1944, which it will be noted was shortly prior to the date on which section 119.1 was adopted,

the board of supervisors passed a Salary Standardization Ordinance fixing the compensation of conductors, streetcar operators (female) and motormen of the Municipal Railway at 90 cents an hour for the first six months of their employment, 92½ cents per hour for the second six months, 95 cents an hour for the third six months, and thereafter 97½ cents an hour. The ordinance further provided that employees "entering the municipal service" after July 1, 1944, should be paid the "entrance rate"; and shortly after the election, to wit, on June 5, 1944, the supervisors adopted the "annual salary ordinance" fixing the compensation of the employees of the Municipal Railway the same as was fixed by the Salary Standardization Ordinance; and it provided also that all employees entering the municipal service after July 1, 1944, should be paid the entrance rate. Therefore, since the Market Street system was not to be taken over by the city until September 29, 1944, all employees of that system entering the city service would, under the provisions of existing salary ordinances, be paid only at the "entrance rate." And as above stated, about August 1, 1944, the mayor was advised that approximately 90 per cent of the Market Street platform personnel were intending to terminate their services and obtain employment in war industry plants unless they were assured of parity pay. He was so informed by the president and the secretary of the carmen's union and their associates; also by those in charge of the city's public utilities. The union secretary told the mayor the matter was acute—that the men were aroused—that if they entered the city service they would lose many advantages, among them being certain governmental social security rights peculiar to private employment, and numerous working advantages; and that unless they got parity pay they would not continue in their positions but would seek employment elsewhere. Mr. Edward G. Cahill, the manager of utilities, talked to the personnel of the Market Street line and their union representatives, and he testified that he became convinced that some 90 per cent of the Market Street employees would not come into the city service unless they received parity pay. Nine hundred had signed cards pledging they would not go to work for the city unless they received parity pay. Questionnaires were sent out, and 300 employees failed to answer, so that the status of this number was not known. The Civil Service Commission had posted a list in the car barns of 513 Market Street employees who

would not be eligible for service with the city. Mr. Cahill testified that he put these facts before the mayor and told the mayor that if 90 per cent of the employees of the Market Street line failed to come over to the city service, the Market Street division of the consolidated system would have to be shut down until the management was able to train new employees, and that it would take a year to put it back into operation if they had to train all new personnel. The vice president of the Market Street company also informed the mayor that he was fearful of what might be the situation on September 29th unless the Market Street employees were assured of wages based on their experience and comparable to wages being paid to Municipal employees; that a large number of the Market Street employees had already quit and taken other employment. And it was quite obvious that the declared intention of the Market Street employees to discontinue their services and seek other employment unless they received parity pay was not an idle threat because there had been an acute labor shortage in the San Francisco area for about two years which constituted an actual manpower shortage. It involved all important industries in the bay area as well as the transportation lines which served such industries. In August, 1944, the War Manpower Commission promulgated a program making it mandatory on commission officials to staff certain establishments in the bay area, designated as ''must'' because they were producing items of immediate need and necessity in the war effort; and various industries were advertising for additional employees in the newspapers, on billboards, over the radio and through the United States Employment Service. Mr. Cahill also testified that there was already a vast shortage in the platform personnel of the Market Street company, and that many of its cars remained idle as the result thereof; that only 150 applicants could be trained every three weeks due to lack of instructors and other problems, and that only 50 out of 150 trainees eventually became employees. At these conferences the provisions of section 25 of the charter and the scope of the power that could be exercised thereunder by the mayor were also thoroughly discussed; and among others Mr. Cahill and the city controller advised the mayor that in order to prevent a shut down of the Market Street system it was imperative that he exercise the emergency powers conferred by section 25; and the mayor testified that he had definitely

reached the same conclusion. Finally, the city attorney drafted and the mayor signed the necessary proclamations.

The evidence also shows and the trial court found that as the result of the wars in which the United States was engaged, the port of San Francisco had become the greatest naval port in the world, and that the city of San Francisco was the very heart of the multifarious industries involved in the centralization of the tremendous war effort in this locality. The stress and strain caused by the movement of troops, warships, munitions and other supplies through the port of San Francisco to various strategic points in the Pacific area was augmented by the establishment in and about San Francisco of numerous naval, military and other federal emergency agencies, as well as various government and privately owned shipyards and other enterprises engaged in producing and repairing the instruments of war. Most of these numerous war industries located about the bay area had their headquarters in San Francisco. Thousands of persons employed in San Francisco were compelled to live, because of the acute housing shortage, in nearby communities. Thousands of other employees, working in different points about the bay, were compelled, for the same reasons to live in San Francisco. These catastrophic conditions were aggravated by the acute housing shortage and the constantly increasing cost of living, all of which contributed to the severe labor shortage. The many thousands of newcomers used the public utilities, including streetcars, even out of proportion to the rapidly swelling population. During rush hours standing room on streetcar fenders came at a premium. The acute scarcity of labor developed into one of the most alarming aspects of this threatening public emergency. Many operable streetcars were not operated because of the manpower shortage. Fantastic wages were paid everywhere for unskilled labor. Employers vied with each other in using newspaper display advertising, radio, billboards and personal solicitation in seeking help.

Furthermore the evidence shows and the trial court found that due to the geographical location of San Francisco, its streetcar transportation systems became a most vital artery in the tremendous emergency job that was being carried on. Gasoline was rationed, and had the overtaxed street railway system broken down, to any appreciable extent, the war effort would have been dangerously crippled; and certainly the threatened impairment of the war effort actually threatened

the lives, property and welfare of the people of the entire bay area, as well as the property of the city of San Francisco. Moreover, the federal and state Governments, and many of the municipalities were operating under emergency laws. As stated by the trial judge in the oral opinion delivered by him in deciding the case, the failure of the mayor, under the existing circumstances, to declare an emergency and direct a parity of pay so as to prevent the shut down of the Market Street division of the consolidated street railway system would have amounted to a dereliction of duty.

It was apparent that any attempt to follow the normal procedure prescribed by section 151 of the charter would have delayed the granting of parity pay for more than a year after the time of the crisis, because the effect of the provisions of that section is that an ordinance fixing the compensation of any employee included in the schedule of compensations adopted subsequent to April 1, 1944, would not become effective until July 1, 1946. In the present case the Salary Standardization Ordinance was passed prior to the election by which the charter was amended so as to purchase the Market Street line; and there was no assurance at the time it was passed that the charter would be so amended, because the purchase of the Market Street line had been several times rejected by the voters.

Much more evidence could be narrated showing the absolute necessity for the action taken by the mayor in exercising the emergency powers conferred upon him by section 25, but it would seem that the foregoing is more than sufficient to sustain the trial court's decision in so holding.

In support of his contention that no emergency, as that term is used in section 25 of the charter, existed at the time the proclamations were issued, appellant argues that such an emergency exists only after the happening of a public disaster which has been brought about by an earthquake, or a fire, flood, bombing or similar calamity; that therefore even though 90 per cent of the Market Street Railway employees did threaten to terminate their services and obtain other employment when the city took over the Market Street system unless they were granted parity pay with the Municipal Railway employees for like services, such situation did not constitute an emergency within the meaning of said section 25. There is no merit in the contention or in the argument advanced in its support.

■ As will be noted, section 25 declares that "in case of a public emergency involving *or threatening* the lives, property *or welfare of the citizens, or the property of the city and county,* the mayor shall have power" etc. (Italics added.) And there is no language used in the section indicating that it was intended to restrict its operation to emergencies brought about by the elements, bombings or like causes. Furthermore, the courts of this state have consistently held in numerous cases that as defined by Webster, the word "emergency" means "an unforeseen occurrence or combination of circumstances which calls for immediate action or remedy." For instance, in *County of Los Angeles* v. *Payne,* 8 Cal.2d 563 [66 P.2d 658], the Supreme Court said: "This court . . . accepted the definition of emergency given by Webster as, 'An unforeseen occurrence or combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency.'" Among the other California cases holding to the same effect are *Fennessey* v. *Pacific G. & E.,* 20 Cal.2d 141 [124 P.2d 51], and *Los Angeles Dredging Co.* v. *Long Beach,* 210 Cal. 348 [291 P. 839, 71 A.L.R. 161]. In the former case the Supreme Court said: "The law governing this question indicates that 'emergency' has reference to a method adopted as an expedient for meeting a situation which ordinarily calls for immediate action. (*Mason* v. *Crawford,* 17 Cal.App.2d 529 [62 P.2d 420].)" And in *Los Angeles Dredging Co.* v. *Long Beach, supra,* the Supreme Court said: "To state what constitutes an emergency is not an easy task. The term depends greatly upon the special circumstances of each case; and the authorities are not very helpful in the present inquiry. By definition, the term 'emergency' implies a sudden or unexpected necessity requiring speedy action. (*San Christina Inv. Co.* v. *San Francisco,* 167 Cal. 762, 773 [52 L.R.A.N.S. 676, 141 P. 384]; *Spreckels* v. *San Francisco,* 76 Cal.App. 267 [244 P. 919]; *Mallon* v. *Board of Water Commrs.,* 144 Mo. App. 104 [128 S.W. 764].)" There are also many cases from other jurisdictions holding to the same effect, among them being *People ex rel. Highway Commissioners* v. *Board of Supervisors,* 21 Ill.App. 271, and *Onsrud* v. *Kenyon,* 238 Wis. 496 [300 N.W. 359]. The cases cited by appellant are not in point for the reason that they are based on circumstances essentially different from those here under consideration.

Appellant contends that the evidence shows that there was no emergency because the secretary of the Civil Service Com-

mission testified that the procedure set forth in section 145.1 (war-time appointments under civil service) was adequate to fill any of the needs of the consolidated railway. This testimony, however, was completely overcome by that of Mr. Cahill, the manager of public utilities, who testified that out of 150 applicants sent to the railway by the Civil Service Commission, only 50 eventually became employees; that the railway was only able to train 150 employees every three weeks because that was all the instructors available, so that when the Civil Service Commission sent more applicants than could be adequately trained, the railway asked civil service to send no more people—the result being that regardless of how many people the Civil Service Commission sent as applicants, the railway was still short on platform men and clerical help.

Appellant argues also that the charter provides a complete scheme for the exercise of powers in an emergency, and that the mayor acted contrary to those provisions of the charter; that sections 13 and 16 of the charter specifically authorize the board of supervisors to immediately enact legislation to meet any emergency which actually exists, and which the board must declare to exist, and that such legislation is effective on passage; that, in addition, section 179 provides that ''ordinances necessary to enable the mayor to carry out any of the powers vested in him in the case of a public emergency as defined in section 25 . . . shall not be subject to the referendum.'' It is appellant's contention in effect that these provisions of the charter should have been followed, that is, that the board of supervisors should have declared an emergency, and passed ordinances to enable the mayor to carry out the powers given him by section 25; and that in the absence of any action by the board of supervisors the mayor's action was contrary to the plain provisions of the charter. The provisions of sections 13 and 16 of the charter show, however, that they deal only with an acceleration of the legislative procedure of the board of supervisors and of the effectiveness of the ordinances in cases considered as emergency legislation in that special respect, and that a fair construction of section 179 is that it merely provides for expeditious passage of such ordinances as may be necessary to enable the mayor to carry out the emergency powers vested in him by section 25, but that it does not require any ordinance or resolution to be passed.

Appellant also relies on several of the cases (including the San Christina case, *supra*) which involved the right of the

board of supervisors, under the former charter to declare an emergency and suspend the "dollar tax" limit. He contends that these cases are authority for the proposition that the provisions of the charter cannot be disregarded under the pretext of an emergency. These cases so relied on are clearly distinguishable on their facts. The emergency involved therein was the 1906 fire, and as stated by respondents as late as 1915 the supervisors were "nursing" the emergency, using it as an excuse to raise the tax levy. Furthermore, in those cases the courts held that when the board acted no emergency actually existed; whereas, here, the court held that when the mayor acted it did. Also, the charter provision there involved referred to a "great" emergency, but here the provision (§ 25) reads: "In case of a public emergency involving or threatening the lives, property or welfare of the citizens, or the property of the city and county. . . ."

Appellant next contends that by section 18 of the charter the provisions of the general laws are incorporated into the local charter, and that accordingly the general law, and particularly section 4001 of the Political Code vests the power to fix salaries in the board of supervisors. In order to sustain appellant's theory it would be necessary to hold that the charter which was adopted pursuant to the provisions of sections 6 and 8 of article XI of the Constitution is subject to and limited by the general laws on purely municipal matters; and of course it cannot be so held, because a charter so adopted is supreme over general laws in respect to municipal affairs. As held in *West Coast Advertising Co.* v. *San Francisco,* 14 Cal. 2d 516 [95 P.2d 138], where a city has availed itself of the provisions of sections 6 and 8 of article XI of the Constitution, it has full control over its municipal affairs unaffected by general laws on the same subject matters, and it has such control whether or not its charter specifically provides for the particular power sought to be exercised, so long as the power is exercised within the limitations or restrictions placed in the charter. In other words, under the present charter of San Francisco the city has autonomous rule with respect to municipal affairs; and the operation of its street railway by a municipality is a municipal affair. (*In re Orosi Pub. Utility Dist.,* 196 Cal. 43 [235 P. 1004].) It follows therefore, that where municipal affairs are involved the charter provisions prevail over any conflicting provisions of the general law. Moreover, section 18 of the charter does not incorporate the

general laws into the charter; it merely enjoins officers to discharge their duties as imposed by the general laws; and the cases cited by appellant are easily differentiated from the present one on the ground that the provisions of the charter therein involved especially incorporated the general laws—none of them hold that reference to a general law for one express purpose also incorporates the law in any other respect.

Appellant argues that section 25 does not vest in the mayor the broad powers claimed by respondents; that applying the doctrine of *ejusdem generis* to the charter provision that "the mayor shall have the power, and it shall be his duty, to summon, organize and direct the forces of any department in the city and county in any needed service; to summon, marshal, deputize or otherwise employ other persons, or to do whatever else he may deem necessary for the purpose of meeting the emergency" precludes the interpretation that under these provisions the mayor has the right to fix the compensation of municipal employees; that the word "employ" does not mean to hire, and therefore to fix the compensation of those he hires, but that it simply means "to make use of." In other words, appellant interprets this charter provision as giving the mayor the right to summon or marshal help in times of disaster, which help would be rendered gratuitously by patriotic citizens. He contends that the word "employ" must be interpreted in this way because of the words which precede it (summon, marshal, deputize); also that the last clause, "to do whatever else he may deem necessary for the purpose of meeting the emergency," likewise takes color from what preceded it, and is restricted to a sense analogous to that of those less general. Thus, appellant argues, the mayor may summon, marshal, deputize, employ or do whatever else he may deem necessary in an emergency, but such acts must be in connection with the summoning, marshaling, deputizing or employing (in the sense of "making use of") of persons to meet the emergency; and that it does not and cannot mean that he has the right to hire and to fix the compensation of those he hires.

It has been repeatedly held, however, that the rule of *ejusdem generis* does not apply where the legislative intent is clear from the statute or charter provision itself. As said in California Jurisprudence (vol. 23, p. 756), "The doctrine of ejusdem generis is but a rule of construction to aid in ascertaining the meaning of the legislature, and may be used to carry out, but not to defeat, the legislative intent. Thus if it can

be seen that a particular word following a general word was inserted for a distinct object, and that, to carry out the purpose of the statute, the general word ought to govern, the ejusdem generis rule should not be applied. The doctrine must also yield to the rule that every part of a statute should, if possible, be upheld and given its proper force.'' It is clear from reading the words employed in section 25, that the powers granted thereby are very broad, and that there was no intention on the part of the freeholders who framed the section, nor the voters who adopted it, to place thereon the narrow restrictions contended for by appellant. As will be seen, the phrase ''to do whatever else he may deem necessary for the purpose of meeting the emergency'' is a clear and sharp expression of the intent to give wide powers, which is inconsistent with the theory that it is a restriction to do nothing more than acts with respect to summoning, marshaling, deputizing and employing of persons to meet the emergency.

The attack respondents make upon the soundness of appellant's contention that the word ''employ'' as used in section 25 does not mean to hire and therefore to fix the compensation of those hired, finds substantial support in the case of *City of Youngstown* v. *First Nat. Bank,* 106 Ohio 563 [140 N.E. 176]. There the question was presented as to whether additional police, which the mayor had by statute been empowered to employ for an emergency, were entitled to pay, and the court held that the city was liable for the pay, notwithstanding the fact that the statute did not say anything about it. The court said (p. 178 [140 N.E.]) : ''When one employs another in some work or service, it is the common ordinary understanding that there shall be a resulting or reciprocal compensation for such work and service rendered by such employee.''

Appellant concedes that section 25 is a broad section and contains general and comprehensive language, but he contends that the construction placed on it by the trial court is inconsistent with other specific sections of the charter. He calls attention to the sections of the charter relating to compensation of public employees and the manner in which it shall be fixed, and argues that by these sections the duty and responsibility of fixing salaries for employees of the city rests entirely with the board of supervisors; that no exceptions are made therein, and that under the rules of statutory construction these specific sections prevail over a general section such

as section 25; and that if it had been intended that these specific sections were to be inoperative during an emergency, unmistakable language would appear therein.

While it is true that, ordinarily, specific provisions in a charter will supersede general ones, it is self-evident from the very broad language of section 25 that it was intended to prevail, in an emergency, over the provisions of the charter written for ordinary times; that otherwise the concluding paragraph of section 25 would be meaningless. In other words, although the power to fix the compensation of municipal employees is vested in the board of supervisors, these powers, by the broad terms of section 25, may be suspended in an emergency. None of the cases cited and relied on by appellant, holding that the board of supervisors has exclusive power to fix salaries, involved an emergency.

Appellant also argues that any power that the mayor might have had to fix salaries was taken away by section 151 of the charter, the salary standardization section, and that if it had been intended to give the mayor any control over public salaries some mention would have been made of that intent in section 151. However, as contended by respondents, if the provisions of section 25 supersede the ordinary provisions of the charter in case of an emergency, then section 151 would also be superseded by section 25.

■ Nor is there any merit in appellant's contention that the mayor's attempt to order payment to employees in excess of the compensation to which they were legally entitled under the salary ordinance and the Civil Service Commission rules would constitute an attempt on the part of the mayor to make a gift of public funds, and would therefore be a violation of section 31 of article IV of the Constitution. The case of *Conlin* v. *Board of Supervisors*, 99 Cal. 17 [33 P. 753, 37 Am.St. Rep. 17, 71 L.R.A. 474], upon which appellant relies, was decided when the city and county of San Francisco was operating under a former charter which constituted a direct grant of power from the Legislature, whereas now it is operating under a freeholders' charter; and it has been definitely held that section 31 of article IV has no application to a city operating under a freeholders' charter, and that where a city is so operated it is subject only to the restrictions and limitations provided for in its charter (*Los Angeles G. & E. Corp.* v. *Los Angeles*, 188 Cal. 307 [205 P. 125]); that is to say, since the amendment in 1914 of section 6 of article XI of the Constitu-

tion, which gives the right to chartered cities to control their municipal affairs, the charter of a city availing itself of that right is the supreme law of the city on its municipal affairs, and section 31 of article IV of the Constitution does not apply to such a chartered city. (*Smith* v. *City of Glendale*, 1 Cal. App.2d 463 [36 P.2d 1083].)

As hereinbefore stated, the original Salary Standardization Ordinance was passed March 20, 1944; the election authorizing the acquisition of the Market Street line was held on May 16, 1944; and the mayor's proclamations were issued in August and September of that same year. In September, 1944, a new Salary Standardization Ordinance and Annual Salary Ordinance were passed by the board of supervisors and approved by the mayor. These later ordinances were exact duplicates of the ordinances passed in March and June of 1944, all of which were effective forthwith, by reason of the emergency provisions thereof. They did not make any changes in the compensation to be paid the employees, but only in the number of employees affected thereby, and as stated in these ordinances they were passed as emergency measures to become effective forthwith because of the time limitation provided for in the charter. In this regard it will be remembered that section 151 of the charter provided in effect that if an ordinance fixing the compensation of any employee or class of employees included in the schedule of compensations was adopted subsequent to April 1, 1944, it would not become effective until July 1, 1946. Appellant contends that since the new Standardization and Annual Salary Ordinances were adopted by the board and approved by the mayor after the issuance of his proclamations, they superseded and repealed the proclamations. This contention is not sustainable. These later ordinances did not purport to repeal the proclamations. It is clear that they were not intended to have any influence whatsoever on the emergency proclamations of the mayor. They did not deal with the actual emergency, but were based on normal pay and enacted as part of the ordinary financial machinery of the city, and were intended to become operative only after the emergency had passed. The emergency proclamations of the mayor stand in the relation of a special and exceptional rule to the ordinances of the board of supervisors, which constitute the general rule for normal times. In such case the special rule remains in force as an exception to the general rule, during the emergency, and only during the emer-

gency. Upon the termination of the emergency and the lifting of the emergency proclamations (and this could have conceivably happened at any time), the usual and ordinary financial ordinances would then become fully effective. Neither the board nor the mayor knew, at the time the mayor issued the emergency proclamations, or at the time said ordinances were adopted, how long the actual emergency would last. For that reason, principally, the supervisors were justified in leaving the exercise of the emergency powers to the mayor.

Appellant contends that the mayor's proclamation constituted an attempt to amend the charter and was void under section 8 of article XI of the Constitution because the amending procedure of that provision was not followed. He argues that when the mayor in the exercise of his emergency power suspends charter provisions or supersedes them he is amending them under another name. Admittedly, however, there is no section of the charter prescribing that the Market Street Railway personnel should receive only beginner's pay; and this is the only part of the emergency proclamation which is of importance; therefore, there is no question of amending the charter. Moreover, an emergency measure which prescribed a temporary deviation from an express rule of the charter is not an amendment of the charter requiring the procedure of section 8 of article XI of the Constitution, if another charter provision expressly grants the power to do so.

As claimed by respondents, an analysis of the San Francisco Charter shows that it grants the mayor unusually broad and extensive executive, administrative and emergency powers, all of which culminate in the admittedly vast emergency powers conferred upon him in the concluding paragraph of section 25 of the charter, which is here involved. In the present case appellant has indulged in some criticism of the broad emergency powers thus granted to the mayor. But it should be borne in mind that we are not here dealing with a political question. The charter was prepared by a board of freeholders elected by the people of the city, and afterwards adopted by the voters of the city, and any of its provisions may be changed at any time by the voters. It is not, however, within the power of the courts to amend, revise or rewrite any portion of the charter. Of course the exercise of the emergency powers by the mayor must be reasonable and must be invoked only to protect the lives, property or welfare of the citizens or the property of the city and county, and then only when

such an emergency actually exists; and the emergency action of the mayor is always subject to judicial review. In the present case the trial court, after hearing all of the evidence, decided that the mayor had not abused the emergency powers conferred upon him, and the evidence, in our opinion, fully sustains the trial court decision.

At the oral argument on appeal, additional briefs were asked for on the question of the applicability of section 125 of the charter as construed in *Handlon* v. *Wolff*, 72 Cal.App.2d 53 [164 P.2d 46], which was decided subsequent to the filing of the briefs in this case. Since, however, the present action was decided in the trial court upon the issue of legality of the mayor's action in exercising the emergency powers conferred upon him by section 25 of the charter, and since there is ample evidence to sustain the trial court's conclusion on that issue, we do not deem it necessary to discuss or decide the question argued in the additional briefs.

The other points raised in the briefs are but incidental to those discussed, and are determined by the decision of the main points involved.

The judgment is affirmed.

Ward, J., concurred.

PETERS, P. J.—I concur in the order affirming the judgment but I do so on different grounds from those set forth in the majority opinion.

It is there held that the various proclamations of the mayor were justified in that an emergency in fact existed within the meaning of section 25 of the charter, and that under that section the mayor possesses the vast and practically unlimited powers described in the majority opinion. The results of such a holding are far reaching indeed. It means that if the mayor determines that there is an emergency, and if the evidence of the existence of such emergency is conflicting, the mayor has unlimited and unrestricted power by proclamation and executive fiat to set aside and to disregard every ordinance passed by the lawmaking body, even though the lawmaking body is then available in session, and even though all departments of government, including the lawmaking body are then functioning, and to set aside and to disregard every other provision of the charter limiting the mayor's powers. In a very real sense such a holding means that during the existence of such

an emergency the mayor, and the mayor alone, constitutes the entire government of the city. If it be assumed that the charter confers such unusual and extraordinary powers on the mayor (and I have grave doubts that section 25 was ever intended to have the broad effect given to it by the majority) it is quite clear that the provision should not be called into operation unless an emergency of the gravest nature exists.

In the present case the fundamental question presented was whether the Market Street employees, when the Market Street system was taken over by the city and county, were entitled to "parity" pay, or were entitled to beginner's pay. There was no doubt an extremely grave situation presented when the Market Street platform and other operating employees threatened not to accept employment with the city and county unless they were granted "parity" pay. Had that portion of the streetcar system been forced to cease operations during that critical war period it would have been a catastrophe not only to the city but to the nation. But that grave situation did not call for the declaration of an emergency within the meaning of section 25, and the setting aside of the normal functions of government, because, in my opinion, as a matter of law, quite independent of the mayor's proclamations, the Market Street operating employees were entitled to parity pay.

Section 125 of the charter provides, in part, that: "All persons employed in the operating service of any public utility hereafter acquired by the city and county, at the time the same is taken over by the city and county, and who shall have been so employed for at least one year prior to the date of such acquisition, *shall be continued in their respective positions and shall be deemed appointed to such positions, under, and entitled to all the benefits of, the civil service provisions of this charter;* provided, however, that no person who is not a citizen of the United States shall be so continued in or appointed to his position. . . ." (Italics added.)

There can be no doubt at all that under this section the Market Street operating personnel had a charter right to be blanketed into civil service. But the charter does not merely give these employees the right to be employed as beginners. It provides that they shall be "continued in their respective positions" and "shall be deemed appointed to such positions" and entitled to "all the benefits" of civil service. That language clearly and without ambiguity provides that the positions these employees had with Market Street shall be contin-

ued, and that in such positions such employees shall be entitled to the civil service rights attaching to those positions. The charter itself gives the employees this right without the necessity of further action by the mayor, the board of supervisors, or the civil service commission. The charter guarantee is to a position substantially similar in kind and degree to the one held by them under Market Street. The language quoted is capable of no other reasonable construction.

This construction is not mine alone but is the exact construction given to section 125 by the unanimous opinion of this court in the recent case of *Handlon* v. *Wolff*, 72 Cal.App.2d 53 [164 P.2d 46], where at page 58 it is stated: "In effect section 125 provides that if one has been employed for one year in an acquired utility such employee shall be deemed appointed to such position and entitled to 'all benefits' of the service under the municipality. 'Such position' if not the identical position should be interpreted as meaning a similar position in kind and degree—one that in salary, authority, duties, etc. is reasonably comparable to the employee's former position. If no comparable position exists then it appears that 'such position' by the terms of the charter is 'continued.' The 'position' in the private utility is adopted as a city position. The legislative or administrative means of continuing the employee in his position is a mechanical problem subordinate to the declaration in the freeholder's charter that he 'shall be continued' in his position."

It seems too clear to require extended argument that an employee with important seniority rights attaching to his position with Market Street is not "continued" in his "respective" position, nor in the words of the Handlon case, has he been appointed to "a similar position in kind or degree—one that in salary, authority, duties, etc. is reasonably comparable to the employee's former position," if after working for Market Street for many years he is offered a beginner's job with no seniority benefits with the city, and at beginner's pay. Such a holding would mean that the Market Street employee would not be given substantially the same position with the city that he had with Market Street, but would be offered a position substantially, materially and realistically lower in rank.

Appellant contends that such a construction would mean that the Market Street employees would be entitled to the retirement benefits provided for city and county employees.

That conclusion by no means follows. The retirement system is a contributive one. The Market Street employees have not contributed for the period they were working for Market Street. Retirement benefits are not civil service benefits *per se*. They are the result of a special charter enabling provision, and statutes passed pursuant thereto. They have no relation to the "kind" or "degree" of position involved.

For these reasons I believe the judgment should be affirmed, not because there was an emergency within the meaning of section 25, but because the Market Street employees were entitled to all the benefits purportedly granted them by the mayor's proclamation by virtue of section 125 of the charter.

A petition for rehearing was stricken from the files on July 26, 1946, for the reason that it contained statements that were untrue and must have been known to the petitioner to be untrue. Appellant's petition for a hearing by the Supreme Court was denied August 22, 1946. Carter, J., voted for a hearing.